**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | |
|---|---|
| T1 G1 DALLAS SOLAR MODULE (TRINA) LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>TKO STAFFPROS, LLC,<br><br>*Defendant*. | CIVIL ACTION NO. 4:25-cv-01470<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff T1 G1 Dallas Solar Module (Trina) LLC ("T1"), formerly known as Trina Solar US Manufacturing Module 1 LLC, by and through its undersigned counsel, files this complaint against Defendant TKO StaffPros, LLC ("TKO"). In support, T1 states as follows:

**SUMMARY**

1. This case is about TKO's fraudulent conduct in purporting to run criminal background checks on temporary workers it placed at T1's manufacturing facility. TKO promised in its Staffing Agreement with T1 to perform comprehensive, national criminal background checks for every worker it placed. Instead, TKO never intended to, and never did, adequately screen its workers. Then, when T1 questioned TKO's performance, TKO *forged* the requested background reports, passing them off to T1 as if they were authentic. TKO's intentional misconduct resulted in, among other things, placing individuals with serious, violent prior offenses on the T1 jobsite, all unbeknownst to T1. TKO's actions also breached its express contractual promises and representations to T1, promises on which T1 relied when entering its Staffing Agreement with TKO and paying TKO more than $17 million. T1 brings this action to recover those fees and other damages resulting from TKO's misconduct.

## PARTIES

2. Plaintiff T1 G1 Dallas Solar Module (Trina) LLC is a limited liability company incorporated under the laws of the State of Texas and having its principal place of business in the State of Texas. T1's members are T1 G1 Dallas Associated Entity LLC, a Texas LLC, and T1 Dallas Midco Inc., a Delaware corporation with its principal place of business in Texas. T1 G1 Dallas Associated Entity LLC's sole member is T1 Dallas Midco Inc. T1 operates an advanced American solar manufacturing facility in Wilmer, Texas, with the goal of building domestic solar supply chains to invigorate America with scalable, reliable, and low-cost energy.

3. Defendant TKO StaffPros, LLC is a Mississippi LLC with its principal place of business in Guntown, Mississippi. TKO's sole member is Mike Jones ("Jones"), a natural person and resident of the state of Mississippi. TKO maintains an office at 2020 E Randol Mill Road, Suite 300, Arlington, Texas, in Tarrant County.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as Plaintiff T1 is diverse from Defendant TKO and the value of the claim exceeds the jurisdictional amount. For purposes of diversity jurisdiction, T1 is a citizen of Texas and Delaware, and Defendant TKO is a citizen of Mississippi.

5. This Court has specific personal jurisdiction over Defendant TKO, pursuant to constitutional due process and the Texas Long-Arm Statute, due to at least TKO's extensive activities of the United States District Court, Northern District of Texas (this "District"). TKO has purposefully availed itself of the privileges of doing business in Texas, specifically soliciting and contracting with Texas businesses, holding itself out as maintaining, and in fact maintaining, a Texas-based office in Arlington for the purpose of facilitating its Texas clients, recruiting Texans for employment in Texas, and registering itself with the Texas Secretary of State. TKO's liability arises

out of TKO's contacts in Texas. T1's claims arise out of TKO's breach of the parties' agreement, as well as the fraud that TKO conducted in Texas.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas. Additionally, TKO maintains an office in Tarrant County.

## STATEMENT OF FACTS

### A. T1 operates a manufacturing facility in Wilmer, Texas, employing hundreds of Texans.

7. T1 is a Texas-based energy company, a subsidiary of T1 Energy, Inc. T1 operates an advanced American solar manufacturing facility in Wilmer, Texas, with the goal of building domestic solar supply chains to invigorate America with scalable, reliable, and low-cost energy.

8. T1 opened its 1.35 million square foot high-power solar panel and module manufacturing facility in late 2024. T1 invested more than $200 million in the five-gigawatt capacity facility, which now employs more than 1,200 Texans and produces more than 20,000 panels per day.

9. T1's five-gigawatt Wilmer plant is a key part of T1's broader Texas-based solar supply chain, aiming to use domestic cells (including from the in-development G2 Austin cell plant) to make finished modules in Wilmer, creating high-quality solar products and local jobs. The facility produces advanced TOPCon modules and is a cornerstone of T1's strategy to meet surging U.S. energy demands.

### B. TKO solicits T1's business, and the parties enter into the Staffing Agreement.

10. T1's ambitious manufacturing plans for the Wilmer facility required hundreds of workers. Given T1's hiring needs, several staffing agencies solicited T1's business, one of which was TKO.

11. TKO is a staffing company that advertises its services as "specializ[ing] in matching top talent with leading companies" and "stream[lining] the recruiting process to meet [] staffing

needs."[1] TKO represents that it offers "tailored staffing solutions" for companies to "[f]ind the perfect fit . . . without the headache of sorting through applications."[2] TKO's company logo includes the words "Trust," "Knowledge," and "Opportunity"—presumably the source of the company's name.[3]

12. TKO was eager to secure T1's substantial Texas business. TKO's key personnel, including its founder and owner Jones, traveled in-person from Mississippi to T1's Wilmer facility to pitch T1's management on TKO's services.

13. At that sales pitch, TKO made statements that proved to be false and intended to induce T1 into entering into an agreement. TKO promised T1 it would perform comprehensive, national criminal background checks for each and every individual it proposed placing at T1. T1 relied on these representations, and on April 10, 2024[4], Trina Solar US Manufacturing Module 1 LLC (T1's predecessor entity) and TKO entered into Agreement for Services (the "Staffing Agreement").[5] Ex. A. The Staffing Agreement between the parties was negotiated in and entered into in Texas for the provision of staffing services at T1's manufacturing facility in Wilmer, Texas.

14. Under the Staffing Agreement, TKO agreed to "assign and supply employees to [T1] on a temporary basis to supplement [T1's] workforce." Ex. A (Staffing Agreement) at 1. These "Assigned Employees" or "Assigned Workers" would remain employees of TKO, which remained responsible for their orientation, payment of their wages, benefits, payroll taxes, and similar administrative matters. *Id.* § 1. Under the Staffing Agreement, T1 paid TKO "for its performance" at specified rates and on a weekly basis. *Id.* § 3. Specifically, TKO's fees were calculated "at a thirty-

---

[1] https://www.tkostaffpros.com/about.
[2] https://www.tkostaffpros.com/
[3] *Id.*
[4] T1 signed the agreement March 28, 2024. TKO signed the agreement April 10, 2024.
[5] The Staffing Agreement was entered into by TKO StaffPros, LLC and Trina Solar US Manufacturing Module 1, LLC. Trina Solar US Manufacturing Module 1, LLC was renamed T1 G1 Dallas Solar Module (Trina) LLC in April 2025.

five (35) percent markup over the temporary associate pay rate." *Id.* at 7 (Ex. A to Staffing Agreement). Those fees were later reduced slightly in April 2025 to a thirty (30) percent markup. The Staffing Agreement memorialized the promise that TKO made in its sales pitch to T1, specifically to "[p]erform a national criminal database search for all employees placed on assignment at [T1]'s location," including a search of "the National Sex Offender Registry." *Id.* § 1(c).

15. TKO's "Duties and Responsibilities" under the Staffing Agreement thus included:

- "Recruit, screen, interview, and assign" employees to perform work for T1. *Id.* § 1(a).
- "Administer 10-panel drug screen to all Assigned Employees." *Id.* § 1(b).
- "Perform a national criminal database search for all employees placed on assignment at [T1's] location. This search will include the National Sex Offender Registry." *Id.* § 1(c).
- "[C]ooperate fully and to provide assistance to [T1] in the investigation and resolution of any complaints, claims, actions, or proceedings . . . that may involve Assigned Employees." *Id.* § 5(a).

16. Only later did T1 discover that TKO had never intended to, and never did, adequately screen or run proper background checks on these workers as promised in April 2024.[6]

**C. TKO represents that it reviews all criminal history and will not assign workers with criminal histories to T1.**

17. In addition to its contractual requirement to perform criminal background searches, TKO's screening policies stated that TKO would run a "Criminal Background Check," using TKO's "access to multiple CBC companies" for each candidate. In an email dated August 19, 2025, Jones represented that TKO had strict screening policies, attaching a PDF entitled "Additional CBC Prescreening." This document outlined TKO's process, including a claim that "[i]f there are any

[6] The cost to conduct proper and routine pre-employment criminal background checks—including a national database search and a National Sex Offender Registry search—is minimal on a per-candidate basis, typically ranging from $10 to $80.

charges on the candidate's background, approval must be given by client." Jones's email further asserted, "[r]egardless of what a client's requirements are, we do not place anyone with a violent or sexual charge on their record." Jones also represented that TKO's "onsite management reviews each candidate's information to make sure the process has been completed and documented." T1 relied on Jones's representations in continuing to do business with TKO and to staff its employees at T1's Wilmer facility.

**D. T1 discovers TKO employees assigned to T1 were not adequately screened and have felony criminal histories.**

18. From the time T1's Wilmer facility began production in late 2024 through October 27, 2025, TKO placed more than 800 workers at T1's facility. T1 paid TKO over $17 million during the same time period, believing that the workers TKO placed were properly screened and the subject of comprehensive criminal background checks. But problems soon began to surface.

19. In March 2025, T1's security department discovered that a forklift operator TKO staffed (and supposedly screened) had prior felony convictions. During the badging and orientation process, T1's security personnel identified prison and gang tattoos on the operator and overheard the operator remarking that he served time in federal prison. T1 promptly conducted its own investigation into the operator's criminal history, which confirmed that the operator had been convicted of federal drug felonies and was only recently released from prison. T1 promptly dismissed this TKO employee.

20. T1 discovered another TKO-placed felon on site in August 2025. On August 18, 2025, T1 personnel emailed TKO's Jones about an employee, M.D., who had a "concerning background with serious, violent charges." T1 asked Jones to "confirm how [M.D.] passed the background check and was able to become employed at T1." Jones promised to investigate and "reply back to you today with what I find out."

21. The next day, Jones admitted that TKO "failed to complete a background check on" M.D. He claimed a TKO recruiter had "misspelled [M.D.'s] name, causing it not to match up with

his social." According to Jones, TKO's process for such an error is to "review the alternative matches suggested or use another search company," but he conceded that, instead of following TKO's purported process, "our Recruiter marked him as good to go and placed a note in our system that he had nothing on his background."

22. Jones also admitted that TKO failed to complete related checks and balances in its screening and staffing process on the employee. Jones reiterated that TKO does not "place anyone with a violent or sexual charge on their record." But in the same email communication, Jones conceded that TKO "did not follow [its] own policy." He acknowledged that: "There is usually no single instance of this type of error. If this mistake was made, the chances of something else not being followed correctly are high."

**E. T1 discovers TKO's fraudulent practice of fabricating background check reports.**

23. Following repeated instances of TKO assigning workers with violent or felony criminal histories, T1 began requiring TKO and other staffing agencies in September 2025 to provide the background check report for each candidate for T1's own review.

24. Initially, TKO provided reports that were often unreadable or in an editable Microsoft Word format. On October 7, 2025, T1 security personnel informed Heather Kalka, TKO's onsite representative ("Kalka"), that T1 "cannot accept an editable MS Word document" and "need[ed] the PDF from the background check provider."

25. On October 24, 2025, Kalka provided several background reports to T1, including one for an employee with first and last initials M.B. (the "10/24 M.B. Report").

26. At 9:38 AM on October 27, 2025, T1's Senior Physical Security Supervisor informed Kalka that five of the submitted candidates were not cleared, including M.B., whose report contained the wrong date of birth. The T1 supervisor told Kalka that the prospective employee could not be

approved for staffing until an accurate report had been processed. At 9:53 AM, Kalka responded, "I will re-run and get the information back to you on" M.B.

27. Just fifty-two minutes later, at 10:45 AM, Kalka sent what she purported to be a new background check, including a revised report for M.B. (the "10/27 M.B. Report").

28. T1 conducted a side-by-side comparison of the 10/24 M.B. Report and 10/27 M.B. Report and noticed font and formatting discrepancies in the "Report Created" date field on the face of the background reports:


Report Created
October 24, 2025


Report Created
October 27 2025

29. Upon further inspection, T1 determined that TKO had not processed a new background report but had manually altered the original. To change the report date from October 24, 2025 to October 27, 2025, TKO had overwritten the original date with a text box. The alteration was apparent because the text overlay used a different font for the number "27" and omitted the comma before the year.

30. T1 examined the rest of the 10/27 M.B. Report and found that the date of birth field had also been manually overwritten in different font to show the correct date of birth:


01/9/2001


01/29/2001

31. T1 then inspected the metadata of both files. The 10/24 M.B. Report had the original title: "Microsoft Word – [P.P.] CBC." P.P. (initials for another TKO employee) was not the subject of the background report, however. The metadata identified a TKO Branch Manager ("Branch Manager") as the author and showed the document was created on 10/24/2025 at 2:51:16 p.m. The

"date modified" field showed the same time. The metadata also indicated the file was converted to PDF using Microsoft's "Print to PDF" function[7]:




---

[7] During its investigation, T1 employees appended a "1" and "2" to the file names of the 10/24 M.B. Report and the 10/27 M.B. Report, respectively (as indicated in the metadata figures below), for ease of identification. T1 has removed the full names of the individuals from the below figures for purposes of this Complaint.

32. The 10/27 M.B. Report, which TKO representatives represented to T1 was a re-processed or newly-run report, contained identical metadata, except the "date modified" field, which now read 10/27/2025 at 10:17:04 a.m:




33. TKO personnel altered the document just 39 minutes after T1 identified the error in the background report and, only 28 minutes later, transmitted the document to T1, representing that it was a new, authentic report.

34. Both the 10/24 M.B. Report and the 10/27 M.B. Report stated, "Our extensive public records search DID uncover arrest, criminal, or traffic records information for [M.B.]," but failed to list any such records.

35. On October 27, 2025 at 6:06 p.m., Kalka emailed T1 with "more background [sic] for your team to check," and "re-sending [M.B.]" This e-mail contained the same altered 10/27 M.B. Report, which again stated, "Our extensive public records search DID uncover arrest, criminal, or traffic records information for [M.B.]," but listed none.

36. The following morning, October 28, 2025, at 9:22 a.m., T1 personnel responded to Kalka, asking her to identify what records the 10/27 M.B. Report uncovered, noting none were listed in the report. At 7:08 p.m. that same day, Kalka responded, "This is the on [sic] the operations manager re ran for us today," and attached yet another background report for M.B. (the "10/28 M.B. Report"). Unlike the prior two reports, the 10/28 M.B. Report stated: "Our extensive public records search did not uncover arrest, criminal, or traffic records information for [M.B.]" The metadata for this third report showed it was drafted in Microsoft Word on "10/28/2025" at "11:16:19am."

37. On October 29, 2025, T1 personnel asked Kalka how criminal background reports conducted using the same identifying information could show there are no criminal records when the first report said the opposite. She responded:

> This is what was sent to me by the owner and our operations manager as they re-ran (10/28/25) the background on [M.B.]. The 1st one was ran [sic] by the office and that was sent to us. I'm not sure if it was an entering information error as that is why the owner and the operations manager re-ran the background.

38. T1 personnel asked Kalka to add the owner and operations manager to the correspondence so they could explain the discrepancy. She replied, "I forwarded message[] to owner and operations manager." T1 received no further response.

39. After discovering these fabrications, T1 reviewed all 82 background reports that TKO representatives had transmitted between September 25, 2025—the date TKO began sharing background reports—and October 27, 2025, the date T1 discovered TKO's alterations. The document metadata revealed that TKO representatives had manually created seventy-nine of them—more than 96 percent—in Microsoft Word, then converted to PDF to appear authentic. Only three reports appeared to be authentic downloads from a background check provider. The metadata of the fabricated reports listed one of three unique authors: (1) Branch Manager; (2) TKO's Operations Manager ("Operations Manager"); or (3) "TKO StaffPros LLC."

40. As a result of its independent investigation into the backgrounds of all TKO-assigned workers, T1 discovered that Jones, Kalka, TKO's Branch Manager, and TKO's Operations Manager had assigned to T1 individuals with criminal histories, including convictions for, among others, aggravated assault with a deadly weapon, possession of a controlled substance with intent to deliver, DWI/DUI, and attempted possession of a firearm by a convicted felon.

**F. T1 is forced to reconstitute its workforce due to TKO's fraud.**

41. On November 21, 2025, following discovery of TKO's fraud, T1 informed all approximately 250 TKO-assigned workers that all would be re-screened and processed before T1 allowed the workers to continue at T1's facility. Rather than undergo re-screening, approximately fifty-eight TKO-placed workers immediately quit and did not return to the facility.

42. Following that wave of departures, T1 was forced to take significant, costly efforts to find, hire, and process dozens of new workers for its facility. T1 was also forced to conduct its own background investigations of the remaining TKO-placed workers.

**G. T1 promptly terminates the Staffing Agreement on November 21, 2025.**

43. On November 21, 2025, T1 sent a letter to Jones, CEO and sole owner of TKO, notifying him that: (1) TKO was in breach of the Staffing Agreement; (2) T1 would not make any

further payments during T1's investigation of TKO's breach; and (3) T1 was terminating the Staffing Agreement.

44. T1 also informed TKO it "uncovered substantial, verified evidence that TKO StaffPros and its employees fabricated background check reports and fraudulently presented them as authentic—violating terms of the Agreement, as well as . . . violating federal law[.]"

**H. TKO demands to be paid despite its fraud and for services it never performed.**

45. In response to T1's termination notice, TKO sent a "Demand for Payment" (the "Demand"), claiming that T1 is required "to pay TKO the total sum of $2,513,411.04" for "services provided under the Agreement" and "early conversion" fees.

46. In its Demand, TKO "denie[d] that it has breached the Agreement" and "has always provided above-standard service to [T1] in compliance with the Agreement." TKO claimed that any purported breach did not "provide any legal basis for [T1] to withhold payment under the Agreement or Texas law."

## CAUSES OF ACTION

## COUNT ONE – BREACH OF CONTRACT

47. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

48. T1 entered into a valid, enforceable agreement with TKO, which included a requirement that TKO "[p]erform a national criminal database search for all employees placed on assignment at [T1's] location," with said search "includ[ing] the National Sex Offender Registry."

49. T1 complied with its obligations under the Staffing Agreement at all times prior to TKO's material breach. T1 paid TKO in excess of $17 million for staffing services, during the same period when TKO was violating the Staffing Agreement by placing workers at T1's facility that were not screened, or not properly screened, for their criminal history.

50. TKO deprived T1 of the benefit it bargained for under the Staffing Agreement: screened personnel without violent or sexual criminal history. TKO cannot and will not cure its breach.

51. T1 suffered damages in excess of the jurisdictional requirements of this Court.

52. All conditions precedent to the enforcement of T1's claims have been satisfied.

**COUNT TWO – FRAUD IN THE INDUCEMENT**

53. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

54. TKO negotiated with T1 to provide staffing services suited to T1's specific needs, which explicitly and prominently included providing employees with clean background checks. Accordingly, the parties memorialized the Staffing Agreement whereby TKO agreed to "[p]erform a national criminal database search for all employees placed on assignment at [T1]'s location," with said search "includ[ing] the National Sex Offender Registry." This covenant was material to T1's decision to execute the Staffing Agreement.

55. However, TKO knowingly and willfully concealed from T1 that it had no intention to or suitable process for adequately screening its employees, if it planned to screen its employees at all. TKO did so with the intent to mislead T1 and induce it to execute the Staffing Agreement. Even after T1 required TKO to provide the background reports to T1, TKO fabricated more than 96 percent of them. Despite its initial representations to T1, there is no indication that TKO ever performed the proper background checks for all placed workers.

56. T1's reliance on TKO's representation caused it to suffer damages. T1 paid TKO over $17 million under the Staffing Agreement in reliance on TKO's promise to perform the covenants contained therein—namely, that it would adequately screen employees before placing them with T1. T1 is entitled to damages equal to its total expenditure in performing the Staffing Agreement in reliance on TKO's representations.

**COUNT THREE – FRAUD**

57. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

58. After repeated instances of TKO placing individuals at T1 with criminal histories, T1 began an audit of TKO's employees and required TKO to submit background checks for all personnel it placed with T1.

59. From at least September 2025 through October 2025, TKO submitted purported "background checks" from a third-party provider for all employees it placed at T1, but T1 identified alarming issues with the reports. TKO knowingly and willingly falsified the background checks it submitted to T1, using text overlays and document conversion tactics to create false reports generated from a template to fit otherwise unacceptable candidates into T1's hiring parameters. Among those falsified reports were the above-described M.B. reports submitted on October 24, 2025, October 27, 2025, and October 28, 2025.

60. Up to the time of discovery, TKO provided at least 82 separate documents purporting to be genuine background checks for TKO employees. T1 relied on the representations TKO made in submitting those reports in allowing those individuals to work at its facility and in paying TKO fees for its services. However, at least 79 of those background checks were falsified, manipulated, forged, or otherwise fraudulent.

61. Due to TKO's fraud, T1 suffered myriad damages. T1 suffered monetary damages in the total amount it paid TKO under the Staffing Agreement. T1 paid TKO over $17 million over the lifetime of the Staffing Agreement for adequate screening services TKO purported to render but never did. T1's workforce weakened because TKO placed unqualified individuals in T1 positions. Further, on discovery of the fraud, T1 incurred the costs of placing candidates with other staffing agencies, hiring replacement workers, and instituting protocols to mitigate any further damage TKO caused by placing unscreened candidates in T1's workforce. High-level T1 employees turned away from

important business matters to devote time and attention to remediating TKO's fraud. T1 is entitled to damages incurred as a result of TKO's fraud.

## COUNT FOUR – NEGLIGENT MISREPRESENTATION

62. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

63. In the alternative to intentional fraud, TKO made negligent misrepresentations to T1 that induced T1 to enter into the Staffing Agreement and to continue to accept TKO employees on site up to the point of termination of the Staffing Agreement.

64. TKO made representations to T1 that it would "[p]erform a national criminal database search for all employees placed on assignment at [T1's] location," with said search "includ[ing] the National Sex Offender Registry." TKO made those representations in the course of its business: "streamlin[ing] the recruiting process to meet [clients'] staffing needs."[8] Without reasonable care, TKO promised to perform background checks to guide T1's business and staffing needs, but that promise was false.

65. T1 justifiably relied on TKO's representations that the employees it would place at T1 were screened and qualified. TKO's business is to provide staffing solutions that fit its clients' needs.[9] T1 communicated its need for screened, qualified candidates, and TKO acknowledged that need—incorporating into the Staffing Agreement that it would screen and submit only qualified candidates for TKO. It was reasonable, then, for T1 to rely on representations TKO made in its course of business.

66. T1 suffered, and continues to suffer, pecuniary loss by justifiably relying on TKO's representation that it would provide screened employees. T1 incurred costs in remediating its

---

[8] https://www.tkostaffpros.com/about.
[9] *Id.*

workforce—through implementation of costly additional screening protocols, emergency replacements, and employment negotiations.

**COUNT FIVE – DECLARATORY JUDGMENT**

67. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

68. As described above, TKO failed to perform its duty under the Staffing Agreement: to "[p]erform a national criminal database search for all employees placed on assignment at [T1]'s location." Agreement § 1(c). T1's consistent position is that "[TKO's] compliance with this this [*sic*] provision is a material obligation under the Agreement and a significant reason why [T1] entered into the Agreement." As such, T1 elected to treat TKO's material breach as a total breach of contract and thus to terminate the Staffing Agreement and cease its performance thereunder promptly upon discovery of TKO's misconduct.

69. Nor did TKO intend to perform its duty to conduct background checks. When TKO made the promise that it would do so, it fraudulently induced T1 to enter into the Staffing Agreement.

70. By letter addressed to T1 dated December 12, 2025, counsel for TKO made a demand for payment in the amount of $2,513,411.04. TKO alleged that T1's termination of the Staffing Agreement has no impact on its payment obligations thereunder. The letter claimed that, at most, TKO's actions would only give rise to a potential claim for indemnification under the Staffing Agreement.

71. TKO's prior material breach of the Agreement nullified any T1 payment obligation under the Staffing Agreement. T1 does not owe TKO any further payment under the Staffing Agreement and is entitled to a declaratory judgment to that effect under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

72. This action reflects an actual, present, and justiciable controversy between T1 and TKO within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. T1's

interests will be adversely affected if TKO continues its assertion that T1 owes it payment pursuant to the Staffing Agreement. These injuries are concrete and particularized and fairly traceable to TKO's position, providing the requisite personal stake and/or interest in the outcome of this controversy necessary for the Court's jurisdiction. A declaratory judgment would protect T1's rights, prevent further injury to T1, and terminate the uncertainty or controversy giving rise to this action.

73. The requested relief would redress the actual, concrete injuries to T1—injuries TKO caused through its claims.

74. Under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, T1 therefore seeks a judicial determination and declaration that:

(a) TKO materially breached the Staffing Agreement when it failed to provide adequately screened employees to T1;

(b) Based on TKO's prior material breach, T1 was under no obligation to perform under the Staffing Agreement—and specifically, T1 was not and is not obligated to pay the demanded amounts to TKO;

(c) Based on TKO's fraud, T1 is not obligated to pay the demanded amounts to TKO; and

(d) Alternatively, at most, any unpaid balance should be treated as an offset against the damages owed by TKO to T1.

**ATTORNEYS' FEES AND COSTS**

75. T1 seeks and is entitled to recover the attorneys' fees incurred in prosecuting this action against TKO. *See* Tex. Civ. Prac. & Rem. § 38.001(b)(8).

**JURY REQUEST**

76. T1 hereby requests a jury trial on all triable issues.

**PRAYER**

77. For these reasons, T1 respectfully requests that the Court ultimately award:

a. Actual, direct, indirect, incidental, and consequential damages, together with pre-and post-judgment interest, including, without limitation, T1's $17 million in out-of-pocket payments made to TKO in reliance on TKO's promises;

b. Exemplary damages;

c. Reasonable attorneys' fees, expenses, court fees, and associated costs;

d. Declaratory relief as requested above;

e. All such other relief to which T1 is entitled at law or equity.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *Scott M. Nelson*
Scott M. Nelson
Texas Bar No. 00797145
scott.nelson@bakerbotts.com
George H. Fibbe
Texas Bar No. 24036559
george.fibbe@bakerbotts.com
910 Louisiana Street
Houston, Texas 77002
Telephone: 713.229.1234
Fax: 713.229.1522

Leslie McCombs Roussev
Texas Bar No. 24082578
leslie.roussev@bakerbotts.com
2001 Ross Ave., Ste 1200
Dallas, Texas 75201
Telephone: 214.953.6516
Fax: 214.953.6503

*Attorneys for T1 G1 Dallas Solar Module (Trina) LLC.*