**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION**

| | | |
|---|---|---|
| **T1 G1 DALLAS SOLAR MODULE (TRINA) LLC** | § | |
| **Plaintiff/Counter-Defendant,** | § | **CIVIL ACTION NO. 4:25-CV-01470-O** |
| **v.** | § | |
| **TKO STAFFPROS, LLC,** | § | |
| **Defendant/Counter-Plaintiff.** | § | |

---

**DEFENDANT TKO STAFFPRO, LLC'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES, AND ORIGINAL COUNTERCLAIM**

---

Defendant TKO StaffPros, LLC ("TKO" or "Defendant") files this Answer to Plaintiff T1 G1 Dallas Solar Module (Trina) LLC's ("T1" or "Plaintiff") Complaint, denies all allegations not specifically admitted herein, and states as follows in response to Plaintiff's Complaint:

## I. TKO'S ORIGINAL ANSWER

TKO answers the specific allegations by paragraph in Plaintiff's Complaint as follows:

### SUMMARY

1. This case is about TKO's fraudulent conduct in purporting to run criminal background checks on temporary workers it placed at T1's manufacturing facility. TKO promised in its Staffing Agreement with T1 to perform comprehensive, national criminal background checks for every worker it placed. Instead, TKO never intended to, and never did, adequately screen its workers. Then, when T1 questioned TKO's performance, TKO forged the requested background reports, passing them off to T1 as if they were authentic. TKO's intentional misconduct resulted

in, among other things, placing individuals with serious, violent prior offenses on the T1 jobsite, all unbeknownst to T1. TKO's actions also breached its express contractual promises and representations to T1, promises on which T1 relied when entering its Staffing Agreement with TKO and paying TKO more than $17 million. T1 brings this action to recover those fees and other damages resulting from TKO's misconduct.

**RESPONSE: TKO denies the allegations in Paragraph 1 of the Complaint.**

## PARTIES

2. Plaintiff T1 G1 Dallas Solar Module (Trina) LLC is a limited liability company incorporated under the laws of the State of Texas and having its principal place of business in the State of Texas. T1's members are T1 G1 Dallas Associated Entity LLC, a Texas LLC, and T1 Dallas Midco Inc., a Delaware corporation with its principal place of business in Texas. T1 G1 Dallas Associated Entity LLC's sole member is T1 Dallas Midco Inc. T1 operates an advanced American solar manufacturing facility in Wilmer, Texas, with the goal of building domestic solar supply chains to invigorate America with scalable, reliable, and low-cost energy.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint and, therefore, denies the same.**

3. Defendant TKO StaffPros, LLC is a Mississippi LLC with its principal place of business in Guntown, Mississippi. TKO's sole member is Mike Jones ("Jones"), a natural person and resident of the state of Mississippi. TKO maintains an office at 2020 E Randol Mill Road, Suite 300, Arlington, Texas, in Tarrant County.

**RESPONSE: TKO denies that Mike Jones is the sole member of TKO. TKO admits the remaining allegations in Paragraph 3 of the Complaint.**

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as Plaintiff T1 is diverse from Defendant TKO and the value of the claim exceeds the jurisdictional amount. For purposes of diversity jurisdiction, T1 is a citizen of Texas and Delaware, and Defendant TKO is a citizen of Mississippi.

**RESPONSE: TKO admits only that it is a citizen of Mississippi. TKO lacks sufficient information to form a belief as to the truth of the remaining allegations contained in Paragraph 4 of the Complaint and, therefore, denies the same.**

5. This Court has specific personal jurisdiction over Defendant TKO, pursuant to constitutional due process and the Texas Long-Arm Statute, due to at least TKO's extensive activities of the United States District Court, Northern District of Texas (this "District"). TKO has purposefully availed itself of the privileges of doing business in Texas, specifically soliciting and contracting with Texas businesses, holding itself out as maintaining, and in fact maintaining, a Texas-based office in Arlington for the purpose of facilitating its Texas clients, recruiting Texans for employment in Texas, and registering itself with the Texas Secretary of State. TKO's liability arises out of TKO's contacts in Texas. T1's claims arise out of TKO's breach of the parties' agreement, as well as the fraud that TKO conducted in Texas.

**RESPONSE: TKO admits only that it is a citizen of Mississippi. TKO lacks sufficient information to form a belief as to the truth of the remaining allegations contained in Paragraph 5 of the Complaint and, therefore, denies the same.**

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas. Additionally, TKO maintains an office in Tarrant County.

**RESPONSE: TKO admits the allegations in Paragraph 6 of the Complaint.**

**STATEMENT OF FACTS**

7. T1 is a Texas-based energy company, a subsidiary of T1 Energy, Inc. T1 operates an advanced American solar manufacturing facility in Wilmer, Texas, with the goal of building domestic solar supply chains to invigorate America with scalable, reliable, and low-cost energy.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint and, therefore, denies the same.**

8. T1 opened its 1.35 million square foot high-power solar panel and module manufacturing facility in late 2024. T1 invested more than $200 million in the five-gigawatt capacity facility, which now employs more than 1,200 Texans and produces more than 20,000 panels per day.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 8 of the Complaint and, therefore, denies the same.**

9. T1's five-gigawatt Wilmer plant is a key part of T1's broader Texas-based solar supply chain, aiming to use domestic cells (including from the in-development G2 Austin cell plant) to make finished modules in Wilmer, creating high-quality solar products and local jobs. The facility produces advanced TOPCon modules and is a cornerstone of T1's strategy to meet surging U.S. energy demands.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 9 of the Complaint and, therefore, denies the same.**

10. T1's ambitious manufacturing plans for the Wilmer facility required hundreds of workers. Given T1's hiring needs, several staffing agencies solicited T1's business, one of which was TKO.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 10 of the Complaint and, therefore, denies the same. TKO admits that it communicated with T1 regarding its staffing needs but lacks sufficient information to form a belief as to the truth of the allegations contained in the remainder of the second sentence of Paragraph 10 of the Complaint and, therefore, denies the same.**

11. TKO is a staffing company that advertises its services as "specializ[ing] in matching top talent with leading companies" and "stream[lining] the recruiting process to meet [] staffing needs."[1] TKO represents that it offers "tailored staffing solutions" for companies to "[f]ind the perfect fit . . . without the headache of sorting through applications."[2] TKO's company logo includes the words "Trust," "Knowledge," and "Opportunity"—presumably the source of the company's name.[3]

**RESPONSE: TKO admits the allegations in Paragraph 11 of the Complaint.**

12. TKO was eager to secure T1's substantial Texas business. TKO's key personnel, including its founder and owner Jones, traveled in-person from Mississippi to T1's Wilmer facility to pitch T1's management on TKO's services.

**RESPONSE: TKO admits that its representative visited Plaintiff's Wilmer facility; otherwise denied.**

13. At that sales pitch, TKO made statements that proved to be false and intended to induce T1 into entering into an agreement. TKO promised T1 it would perform comprehensive, national criminal background checks for each and every individual it proposed placing at T1. T1

[1] https://www.tkostaffpros.com/about.
[2] https://www.tkostaffpros.com/
[3] *Id.*

relied on these representations, and on April 10, 2024[4], Trina Solar US Manufacturing Module 1 LLC (T1's predecessor entity) and TKO entered into Agreement for Services (the "Staffing Agreement").[5] Ex. A. The Staffing Agreement between the parties was negotiated in and entered into in Texas for the provision of staffing services at T1's manufacturing facility in Wilmer, Texas.

**RESPONSE: TKO admits only that it met with T1 personnel to discuss the services to be provided to T1 and that the Staffing Agreement was entered into in Texas. TKO denies the remainder of the allegations in Paragraph 13 of the Complaint and refers to the terms and conditions of the Staffing Agreement as the best evidence of the obligations of the parties.**

14. Under the Staffing Agreement, TKO agreed to "assign and supply employees to [T1] on a temporary basis to supplement [T1's] workforce." Ex. A (Staffing Agreement) at 1. These "Assigned Employees" or "Assigned Workers" would remain employees of TKO, which remained responsible for their orientation, payment of their wages, benefits, payroll taxes, and similar administrative matters. *Id.* § 1. Under the Staffing Agreement, T1 paid TKO "for its performance" at specified rates and on a weekly basis. *Id.* § 3. Specifically, TKO's fees were calculated "at a thirty-five (35) percent markup over the temporary associate pay rate." *Id.* at 7 (Ex. A to Staffing Agreement). Those fees were later reduced slightly in April 2025 to a thirty (30) percent markup. The Staffing Agreement memorialized the promise that TKO made in its sales pitch to T1, specifically to "[p]erform a national criminal database search for all employees placed on assignment at [T1]'s location," including a search of "the National Sex Offender Registry." *Id.* § 1(c).

---

[4] T1 signed the agreement March 28, 2024. TKO signed the agreement April 10, 2024.

[5] The Staffing Agreement was entered into by TKO StaffPros, LLC and Trina Solar US Manufacturing Module 1, LLC. Trina Solar US Manufacturing Module 1, LLC was renamed T1 G1 Dallas Solar Module (Trina) LLC in April 2025.

**RESPONSE: TKO states that the Staffing Agreement speaks for itself. To the extent the allegations in Paragraph 14 are inconsistent with the terms of the Staffing Agreement, TKO denies the same. TKO denies the remainder of the allegations in Paragraph 14 of the Complaint.**

15. TKO's "Duties and Responsibilities" under the Staffing Agreement thus included:

- "Recruit, screen, interview, and assign" employees to perform work for T1. *Id.* § 1(a).
- Administer 10-panel drug screen to all Assigned Employees." *Id.* § 1(b).
- "Perform a national criminal database search for all employees placed on assignment at [T1's] location. This search will include the National Sex Offender Registry." *Id.* § 1(c).
- "[C]ooperate fully and to provide assistance to [T1] in the investigation and resolution of any complaints, claims, actions, or proceedings . . . that may involve Assigned Employees." *Id.* § 5(a).

**RESPONSE: TKO states that the Staffing Agreement speaks for itself. To the extent the allegations in Paragraph 15 are inconsistent with the terms of the Staffing Agreement, TKO denies the same.**

16. Only later did T1 discover that TKO had never intended to, and never did, adequately screen or run proper background checks on these workers as promised in April 2024.[6]

**RESPONSE: To the extent that the allegations of Paragraph 16 of the Complaint contain legal conclusions or legal argument, no responsive pleading is required. To the extent that Paragraph 16 contains factual allegations to which a response is required, TKO denies the allegations in Paragraph 16 of the Complaint.**

---

[6] The cost to conduct proper and routine pre-employment criminal background checks—including a national database search and a National Sex Offender Registry search—is minimal on a per-candidate basis, typically ranging from $10 to $80.

17. In addition to its contractual requirement to perform criminal background searches, TKO's screening policies stated that TKO would run a "Criminal Background Check," using KO's "access to multiple CBC companies" for each candidate. In an email dated August 19, 2025, Jones represented that TKO had strict screening policies, attaching a PDF entitled "Additional CBC Prescreening." This document outlined TKO's process, including a claim that "[i]f there are any charges on the candidate's background, approval must be given by client." Jones's email further asserted, "[r]egardless of what a client's requirements are, we do not place anyone with a violent or sexual charge on their record." Jones also represented that TKO's "onsite management reviews each candidate's information to make sure the process has been completed and documented." T1 relied on Jones's representations in continuing to do business with TKO and to staff its employees at T1's Wilmer facility.

**RESPONSE: To the extent that the allegations of Paragraph 17 of the Complaint contain legal conclusions or legal argument, no responsive pleading is required. To the extent that Paragraph 17 contains factual allegations to which a response is required, TKO states that the Staffing Agreement and referenced email correspondence speak for themselves. To the extent the allegations in Paragraph 17 are inconsistent with the terms of the Staffing Agreement or the referenced email correspondence, TKO denies the same.**

18. From the time T1's Wilmer facility began production in late 2024 through October 27, 2025, TKO placed more than 800 workers at T1's facility. T1 paid TKO over $17 million during the same time period, believing that the workers TKO placed were properly screened and the subject of comprehensive criminal background checks. But problems soon began to surface.

**RESPONSE: TKO admits only that it placed approximately 724 workers at Plaintiff's Wilmer facility and invoiced T1 for the workers and services provided. TKO lacks sufficient information to form a belief as to the truth of the remaining allegations contained in Paragraph 18 of the Complaint and, therefore, denies the same.**

19. In March 2025, T1's security department discovered that a forklift operator TKO staffed (and supposedly screened) had prior felony convictions. During the badging and orientation process, T1's security personnel identified prison and gang tattoos on the operator and overheard the operator remarking that he served time in federal prison. T1 promptly conducted its own investigation into the operator's criminal history, which confirmed that the operator had been convicted of federal drug felonies and was only recently released from prison. T1 promptly dismissed this TKO employee.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 19 of the Complaint and, therefore, denies the same.**

20. T1 discovered another TKO-placed felon on site in August 2025. On August 18, 2025, T1 personnel emailed TKO's Jones about an employee, M.D., who had a "concerning background with serious, violent charges." T1 asked Jones to "confirm how [M.D.] passed the background check and was able to become employed at T1." Jones promised to investigate and "reply back to you today with what I find out."

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 20 are inconsistent with the parties' correspondence, TKO denies the same. TKO lacks sufficient information to form a belief as to the truth of the remaining allegations contained in Paragraph 20 of the Complaint and, therefore, denies the same.**

21. The next day, Jones admitted that TKO "failed to complete a background check on" M.D. He claimed a TKO recruiter had "misspelled [M.D.'s] name, causing it not to match up with his social." According to Jones, TKO's process for such an error is to "review the alternative matches suggested or use another search company," but he conceded that, instead of following TKO's purported process, "our Recruiter marked him as good to go and placed a note in our system that he had nothing on his background."

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 21 are inconsistent with the parties' correspondence, TKO denies the same.**

22. Jones also admitted that TKO failed to complete related checks and balances in its screening and staffing process on the employee. Jones reiterated that TKO does not "place anyone with a violent or sexual charge on their record." But in the same email communication, Jones conceded that TKO "did not follow [its] own policy." He acknowledged that: "There is usually no single instance of this type of error. If this mistake was made, the chances of something else not being followed correctly are high."

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 22 are inconsistent with the parties' correspondence, TKO denies the same.**

23. Following repeated instances of TKO assigning workers with violent or felony criminal histories, T1 began requiring TKO and other staffing agencies in September 2025 to provide the background check report for each candidate for T1's own review.

**RESPONSE: TKO denies the allegations in Paragraph 23 of the Complaint.**

24. Initially, TKO provided reports that were often unreadable or in an editable Microsoft Word format. On October 7, 2025, T1 security personnel informed Heather Kalka, TKO's onsite representative ("Kalka"), that T1 "cannot accept an editable MS Word document" and "need[ed] the PDF from the background check provider."

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 24 are inconsistent with the parties' correspondence, TKO denies the same.**

25. On October 24, 2025, Kalka provided several background reports to T1, including one for an employee with first and last initials M.B. (the "10/24 M.B. Report").

**RESPONSE: TKO admits the allegations in Paragraph 25 of the Complaint.**

26. At 9:38 AM on October 27, 2025, T1's Senior Physical Security Supervisor informed Kalka that five of the submitted candidates were not cleared, including M.B., whose report contained the wrong date of birth. The T1 supervisor told Kalka that the prospective employee could not be approved for staffing until an accurate report had been processed. At 9:53 AM, Kalka responded, "I will re-run and get the information back to you on" M.B.

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 26 are inconsistent with the parties' correspondence, TKO denies the same.**

27. Just fifty-two minutes later, at 10:45 AM, Kalka sent what she purported to be a new background check, including a revised report for M.B. (the "10/27 M.B. Report").

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 27 are inconsistent with the parties' correspondence, TKO denies the same.**

28. T1 conducted a side-by-side comparison of the 10/24 M.B. Report and 10/27 M.B. Report and noticed font and formatting discrepancies in the "Report Created" date field on the face of the background reports:

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and, therefore, denies the same.**

29. Upon further inspection, T1 determined that TKO had not processed a new background report but had manually altered the original. To change the report date from October 24, 2025 to October 27, 2025, TKO had overwritten the original date with a text box. The alteration was apparent because the text overlay used a different font for the number "27" and omitted the comma before the year.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint and, therefore, denies the same.**

30. T1 examined the rest of the 10/27 M.B. Report and found that the date of birth field had also been manually overwritten in different font to show the correct date of birth:

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint and, therefore, denies the same.**

31. T1 then inspected the metadata of both files. The 10/24 M.B. Report had the original title: "Microsoft Word – [P.P.] CBC." P.P. (initials for another TKO employee) was not the subject of the background report, however. The metadata identified a TKO Branch Manager ("Branch Manager") as the author and showed the document was created on 10/24/2025 at 2:51:16

p.m. The "date modified" field showed the same time. The metadata also indicated the file was converted to PDF using Microsoft's "Print to PDF" function:[7]

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 31 of the Complaint and, therefore, denies the same.**

32. The 10/27 M.B. Report, which TKO representatives represented to T1 was a re-processed or newly-run report, contained identical metadata, except the "date modified" field, hich now read 10/27/2025 at 10:17:04 a.m:

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint and, therefore, denies the same.**

33. TKO personnel altered the document just 39 minutes after T1 identified the error in the background report and, only 28 minutes later, transmitted the document to T1, representing that it was a new, authentic report.

**RESPONSE: TKO denies the allegations in Paragraph 33 of the Complaint.**

34. Both the 10/24 M.B. Report and the 10/27 M.B. Report stated, "Our extensive public records search DID uncover arrest, criminal, or traffic records information for [M.B.]," but failed to list any such records.

**RESPONSE: TKO denies the allegations in Paragraph 34 of the Complaint.**

35. On October 27, 2025 at 6:06 p.m., Kalka emailed T1 with "more background [sic] for your team to check," and "re-sending [M.B.]" This e-mail contained the same altered 10/27 M.B. Report, which again stated, "Our extensive public records search DID uncover arrest, criminal, or traffic records information for [M.B.]," but listed none.

---

[7] During its investigation, T1 employees appended a "1" and "2" to the file names of the 10/24 M.B. Report and the 10/27 M.B. Report, respectively (as indicated in the metadata figures below), for ease of identification. T1 has removed the full names of the individuals from the below figures for purposes of this Complaint.

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 35 are inconsistent with the parties' correspondence, TKO denies the same.**

36. The following morning, October 28, 2025, at 9:22 a.m., T1 personnel responded to Kalka, asking her to identify what records the 10/27 M.B. Report uncovered, noting none were listed in the report. At 7:08 p.m. that same day, Kalka responded, "This is the on [sic] the operations manager re ran for us today," and attached yet another background report for M.B. (the "10/28 M.B. Report"). Unlike the prior two reports, the 10/28 M.B. Report stated: "Our extensive public records search did not uncover arrest, criminal, or traffic records information for [M.B.]" The metadata for this third report showed it was drafted in Microsoft Word on "10/28/2025" at "11:16:19am."

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 36 are inconsistent with the parties' correspondence, TKO denies the same. TKO denies the remaining allegations of Paragraph 36 of the Complaint.**

37. On October 29, 2025, T1 personnel asked Kalka how criminal background reports conducted using the same identifying information could show there are no criminal records when the first report said the opposite. She responded:

> This is what was sent to me by the owner and our operations manager as they re-ran (10/28/25) the background on [M.B.]. The 1st one was ran [sic] by the office and that was sent to us. I'm not sure if it was an entering information error as that is why the owner and the operations manager re-ran the background.

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 37 are inconsistent with the parties' correspondence,**

**TKO denies the same. TKO denies the remaining allegations of Paragraph 37 of the Complaint.**

38. T1 personnel asked Kalka to add the owner and operations manager to the correspondence so they could explain the discrepancy. She replied, "I forwarded message[] to owner and operations manager." T1 received no further response.

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 38 are inconsistent with the parties' correspondence, TKO denies the same.**

39. After discovering these fabrications, T1 reviewed all 82 background reports that TKO representatives had transmitted between September 25, 2025—the date TKO began sharing background reports—and October 27, 2025, the date T1 discovered TKO's alterations. The document metadata revealed that TKO representatives had manually created seventy-nine of them— more than 96 percent—in Microsoft Word, then converted to PDF to appear authentic. Only three reports appeared to be authentic downloads from a background check provider. The metadata of the fabricated reports listed one of three unique authors: (1) Branch Manager; (2) TKO's Operations Manager ("Operations Manager"); or (3) "TKO StaffPros LLC."

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 39 of the Complaint and, therefore, denies the same.**

40. As a result of its independent investigation into the backgrounds of all TKO-assigned workers, T1 discovered that Jones, Kalka, TKO's Branch Manager, and TKO's Operations Manager had assigned to T1 individuals with criminal histories, including convictions for, among others, aggravated assault with a deadly weapon, possession of a controlled substance with intent to deliver, DWI/DUI, and attempted possession of a firearm by a convicted felon.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 40 of the Complaint and, therefore, denies the same.**

41. On November 21, 2025, following discovery of TKO's fraud, T1 informed all approximately 250 TKO-assigned workers that all would be re-screened and processed before T1 allowed the workers to continue at T1's facility. Rather than undergo re-screening, approximately fifty-eight TKO-placed workers immediately quit and did not return to the facility.

**RESPONSE: To the extent that the allegations of Paragraph 16 of the Complaint contain legal conclusions or legal argument, no responsive pleading is required. To the extent that Paragraph 41 contains factual allegations to which a response is required, TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 41 of the Complaint and, therefore, denies the same.**

42. Following that wave of departures, T1 was forced to take significant, costly efforts to find, hire, and process dozens of new workers for its facility. T1 was also forced to conduct its own background investigations of the remaining TKO-placed workers.

**RESPONSE: To the extent that the allegations of Paragraph 42 of the Complaint contain legal conclusions or legal argument, no responsive pleading is required. To the extent that Paragraph 42 contains factual allegations to which a response is required, TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 42 of the Complaint and, therefore, denies the same.**

43. On November 21, 2025, T1 sent a letter to Jones, CEO and sole owner of TKO, notifying him that: (1) TKO was in breach of the Staffing Agreement; (2) T1 would not make any further payments during T1's investigation of TKO's breach; and (3) T1 was terminating the Staffing Agreement.

**RESPONSE: TKO states that the correspondence speaks for itself. To the extent the allegations in Paragraph 43 are inconsistent with the parties' correspondence, TKO denies the same.**

44. T1 also informed TKO it "uncovered substantial, verified evidence that TKO StaffPros and its employees fabricated background check reports and fraudulently presented them as authentic—violating terms of the Agreement, as well as . . . violating federal law[.]"

**RESPONSE: TKO states that the correspondence speaks for itself. To the extent the allegations in Paragraph 44 are inconsistent with the parties' correspondence, TKO denies the same.**

45. In response to T1's termination notice, TKO sent a "Demand for Payment" (the "Demand"), claiming that T1 is required "to pay TKO the total sum of $2,513,411.04" for "services provided under the Agreement" and "early conversion" fees.

**RESPONSE: TKO states that the correspondence speaks for itself. To the extent the allegations in Paragraph 45 are inconsistent with the parties' correspondence, TKO denies the same.**

46. In its Demand, TKO "denie[d] that it has breached the Agreement" and "has always provided above-standard service to [T1] in compliance with the Agreement." TKO claimed that any purported breach did not "provide any legal basis for [T1] to withhold payment under the Agreement or Texas law."

**RESPONSE: TKO states that the correspondence speaks for itself. To the extent the allegations in Paragraph 46 are inconsistent with the parties' correspondence, TKO denies the same.**

## CAUSES OF ACTION
## COUNT ONE – BREACH OF CONTRACT

47. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

**RESPONSE: TKO restates and incorporates its responses to paragraphs 1 through 46 above as though fully set forth herein.**

48. T1 entered into a valid, enforceable agreement with TKO, which included a requirement that TKO "[p]erform a national criminal database search for all employees placed on assignment at [T1's] location," with said search "includ[ing] the National Sex Offender Registry."

**RESPONSE: TKO admits the allegations in Paragraph 48 of the Complaint.**

49. T1 complied with its obligations under the Staffing Agreement at all times prior to TKO's material breach. T1 paid TKO in excess of $17 million for staffing services, during the same period when TKO was violating the Staffing Agreement by placing workers at T1's facility that were not screened, or not properly screened, for their criminal history.

**RESPONSE: TKO admits that T1 paid for some of the staffing services provided, but denies the remaining allegations in Paragraph 49 of the Complaint.**

50. TKO deprived T1 of the benefit it bargained for under the Staffing Agreement: screened personnel without violent or sexual criminal history. TKO cannot and will not cure its breach.

**RESPONSE: TKO denies the allegations in Paragraph 50 of the Complaint.**

51. T1 suffered damages in excess of the jurisdictional requirements of this Court.

**RESPONSE: TKO denies the allegations in Paragraph 51 of the Complaint.**

52. All conditions precedent to the enforcement of T1's claims have been satisfied.

**RESPONSE: TKO denies the allegations in Paragraph 52 of the Complaint.**

**COUNT TWO – FRAUD IN THE INDUCEMENT**

53. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

**RESPONSE: TKO restates and incorporates its responses to paragraphs 1 through 52 above as though fully set forth herein.**

54. TKO negotiated with T1 to provide staffing services suited to T1's specific needs, which explicitly and prominently included providing employees with clean background checks. Accordingly, the parties memorialized the Staffing Agreement whereby TKO agreed to "[p]erform a national criminal database search for all employees placed on assignment at [T1]'s location," with said search "includ[ing] the National Sex Offender Registry." This covenant was material to T1's decision to execute the Staffing Agreement.

**RESPONSE: TKO states that the Staffing Agreement speaks for itself. To the extent the allegations in Paragraph 54 are inconsistent with the terms of the Staffing Agreement, TKO denies the same.**

55. However, TKO knowingly and willfully concealed from T1 that it had no intention to or suitable process for adequately screening its employees, if it planned to screen its employees at all. TKO did so with the intent to mislead T1 and induce it to execute the Staffing Agreement. Even after T1 required TKO to provide the background reports to T1, TKO fabricated more than 96 percent of them. Despite its initial representations to T1, there is no indication that TKO ever performed the proper background checks for all placed workers.

**RESPONSE: TKO denies the allegations in Paragraph 55 of the Complaint.**

56. T1's reliance on TKO's representation caused it to suffer damages. T1 paid TKO over $17 million under the Staffing Agreement in reliance on TKO's promise to perform the covenants contained therein—namely, that it would adequately screen employees before placing

them with T1. T1 is entitled to damages equal to its total expenditure in performing the Staffing Agreement in reliance on TKO's representations.

**RESPONSE: TKO denies the allegations in Paragraph 56 of the Complaint.**

**COUNT THREE – FRAUD**

57. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

**RESPONSE: TKO restates and incorporates its responses to paragraphs 1 through 56 above as though fully set forth herein.**

58. After repeated instances of TKO placing individuals at T1 with criminal histories, T1 began an audit of TKO's employees and required TKO to submit background checks for all personnel it placed with T1.

**RESPONSE: TKO lacks sufficient information to form a belief as to the truth of the allegations contained in Paragraph 58 of the Complaint and, therefore, denies the same.**

59. From at least September 2025 through October 2025, TKO submitted purported "background checks" from a third-party provider for all employees it placed at T1, but T1 identified alarming issues with the reports. TKO knowingly and willingly falsified the background checks it submitted to T1, using text overlays and document conversion tactics to create false reports generated from a template to fit otherwise unacceptable candidates into T1's hiring parameters. Among those falsified reports were the above-described M.B. reports submitted on October 24, 2025, October 27, 2025, and October 28, 2025.

**RESPONSE: TKO denies the allegations in Paragraph 59 of the Complaint.**

60. Up to the time of discovery, TKO provided at least 82 separate documents purporting to be genuine background checks for TKO employees. T1 relied on the representations TKO made in submitting those reports in allowing those individuals to work at its facility and in

paying TKO fees for its services. However, at least 79 of those background checks were falsified, manipulated, forged, or otherwise fraudulent.

**RESPONSE: TKO denies the allegations in Paragraph 60 of the Complaint.**

61. Due to TKO's fraud, T1 suffered myriad damages. T1 suffered monetary damages in the total amount it paid TKO under the Staffing Agreement. T1 paid TKO over $17 million over the lifetime of the Staffing Agreement for adequate screening services TKO purported to render but never did. T1's workforce weakened because TKO placed unqualified individuals in T1 positions. Further, on discovery of the fraud, T1 incurred the costs of placing candidates with other staffing agencies, hiring replacement workers, and instituting protocols to mitigate any further damage TKO caused by placing unscreened candidates in T1's workforce. High-level T1 employees turned away from important business matters to devote time and attention to remediating TKO's fraud. T1 is entitled to damages incurred as a result of TKO's fraud.

**RESPONSE: TKO denies the allegations in Paragraph 61 of the Complaint.**

**COUNT FOUR – NEGLIGENT MISREPRESENTATION**

62. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

**RESPONSE: TKO restates and incorporates its responses to paragraphs 1 through 61 above as though fully set forth herein.**

63. In the alternative to intentional fraud, TKO made negligent misrepresentations to T1 that induced T1 to enter into the Staffing Agreement and to continue to accept TKO employees on site up to the point of termination of the Staffing Agreement.

**RESPONSE: TKO denies the allegations in Paragraph 63 of the Complaint.**

64. TKO made representations to T1 that it would "[p]erform a national criminal database search for all employees placed on assignment at [T1's] location," with said search

"includ[ing] the National Sex Offender Registry." TKO made those representations in the course of its business: "streamlin[ing] the recruiting process to meet [clients'] staffing needs."[8] Without reasonable care, TKO promised to perform background checks to guide T1's business and staffing needs, but that promise was false.

**RESPONSE: TKO denies the allegations in Paragraph 64 of the Complaint.**

65. T1 justifiably relied on TKO's representations that the employees it would place at T1 were screened and qualified. TKO's business is to provide staffing solutions that fit its clients' needs.[9] T1 communicated its need for screened, qualified candidates, and TKO acknowledged that need— incorporating into the Staffing Agreement that it would screen and submit only qualified candidates for TKO. It was reasonable, then, for T1 to rely on representations TKO made in its course of business.

**RESPONSE: TKO denies the allegations in Paragraph 65 of the Complaint.**

66. T1 suffered, and continues to suffer, pecuniary loss by justifiably relying on TKO's representation that it would provide screened employees. T1 incurred costs in remediating its workforce—through implementation of costly additional screening protocols, emergency replacements, and employment negotiations.

**RESPONSE: TKO denies the allegations in Paragraph 66 of the Complaint.**

**COUNT FIVE – DECLARATORY JUDGMENT**

67. T1 hereby incorporates all preceding paragraphs as if fully set forth herein.

**RESPONSE: TKO restates and incorporates its responses to paragraphs 1 through 66 above as though fully set forth herein.**

---

[8] https://www.tkostaffpros.com/about.
[9] *Id.*

68. As described above, TKO failed to perform its duty under the Staffing Agreement: to "[p]erform a national criminal database search for all employees placed on assignment at [T1]'s location." Agreement § 1(c). T1's consistent position is that "[TKO's] compliance with this this [sic] provision is a material obligation under the Agreement and a significant reason why [T1] entered into the Agreement." As such, T1 elected to treat TKO's material breach as a total breach of contract and thus to terminate the Staffing Agreement and cease its performance thereunder promptly upon discovery of TKO's misconduct.

**RESPONSE: TKO denies the allegations in Paragraph 68 of the Complaint.**

69. Nor did TKO intend to perform its duty to conduct background checks. When TKO made the promise that it would do so, it fraudulently induced T1 to enter into the Staffing Agreement.

**RESPONSE: TKO denies the allegations in Paragraph 69 of the Complaint.**

70. By letter addressed to T1 dated December 12, 2025, counsel for TKO made a demand for payment in the amount of $2,513,411.04. TKO alleged that T1's termination of the Staffing Agreement has no impact on its payment obligations thereunder. The letter claimed that, at most, TKO's actions would only give rise to a potential claim for indemnification under the Staffing Agreement.

**RESPONSE: TKO states that its correspondence to Plaintiff speaks for itself. To the extent the allegations in Paragraph 70 are inconsistent with the parties' correspondence, TKO denies the same.**

71. TKO's prior material breach of the Agreement nullified any T1 payment obligation under the Staffing Agreement. T1 does not owe TKO any further payment under the Staffing

Agreement and is entitled to a declaratory judgment to that effect under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.

**RESPONSE: TKO denies the allegations in Paragraph 71 of the Complaint.**

72. This action reflects an actual, present, and justiciable controversy between T1 and TKO within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. T1's interests will be adversely affected if TKO continues its assertion that T1 owes it payment pursuant to the Staffing Agreement. These injuries are concrete and particularized and fairly traceable to TKO's position, providing the requisite personal stake and/or interest in the outcome of this controversy necessary for the Court's jurisdiction. A declaratory judgment would protect T1's rights, prevent further injury to T1, and terminate the uncertainty or controversy giving rise to this action.

**RESPONSE: TKO admits that there is a controversy between the parties and denies the remaining allegations in Paragraph 72 of the Complaint.**

73. The requested relief would redress the actual, concrete injuries to T1—injuries TKO caused through its claims.

**RESPONSE: TKO denies the allegations in Paragraph 73 of the Complaint.**

74. Under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, T1 therefore seeks a judicial determination and declaration that:

(a) TKO materially breached the Staffing Agreement when it failed to provide adequately screened employees to T1;

(b) Based on TKO's prior material breach, T1 was under no obligation to perform under the Staffing Agreement—and specifically, T1 was not and is not obligated to pay the demanded amounts to TKO;

(c) Based on TKO's fraud, T1 is not obligated to pay the demanded amounts to TKO; and

(d) Alternatively, at most, any unpaid balance should be treated as an offset against the damages owed by TKO to T1.

**RESPONSE: TKO denies that T1 is entitled the relief requested in Paragraph 74 of the Complaint.**

## ATTORNEYS' FEES AND COSTS

75. T1 seeks and is entitled to recover the attorneys' fees incurred in prosecuting this action against TKO. *See* Tex. Civ. Prac. & Rem. § 38.001(b)(8).

**RESPONSE: TKO denies that T1 is entitled the relief requested in Paragraph 75 of the Complaint.**

## JURY REQUEST

76. T1 hereby requests a jury trial on all triable issues.

**RESPONSE: No response is required.**

## [PLAINTIFF'S] PRAYER

77. For these reasons, T1 respectfully requests that the Court ultimately award:

a. Actual, direct, indirect, incidental, and consequential damages, together with pre-and post-judgment interest, including, without limitation, T1's $17 million in out-of-pocket payments made to TKO in reliance on TKO's promises;

b. Exemplary damages;

c. Reasonable attorneys' fees, expenses, court fees, and associated costs;

d. Declaratory relief as requested above;

e. All such other relief to which T1 is entitled at law or equity.

**RESPONSE: The allegations in Paragraph 77 of the Complaint contain legal conclusions to which no response is required. To the extent a response may be required, TKO denies the allegations in such paragraphs and TKO denies that T1 is entitled the relief requested. To the extent the paragraph requires a responsive prayer, TKO prays that Plaintiff take nothing against it, that this action be dismissed, or that judgment be entered in favor of TKO and for such other relief the Court deems just and proper.**

## II.
## TKO'S AFFIRMATIVE DEFENSES

TKO asserts the following affirmative defenses in response to Plaintiff's Complaint:

1. Plaintiff's claims are barred, in whole or in part, by its failure to state a claim.

2. Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure own material breach of the agreement at issue.

3. Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to act in good faith in complying with its obligations under the law and the Agreement.

4. Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate its damages, if any.

5. Plaintiff's claims are barred, in whole or in part, by its own comparative negligence.

6. Plaintiff's claims are barred, in whole or in part, by actions, omissions, negligence, fraud, and/or breach of obligations by persons other than TKO beyond its supervision and control.

7. Plaintiff's claims are barred, in whole or in part, by waiver.

8. Plaintiff's claims are barred, in whole or in part, by estoppel.

9. Plaintiff's claims are barred, in whole or in part, by ratification.

10. Plaintiff's claims are barred, in whole or in part, by the doctrine of acquiescence, unclean hands, and/or unjust enrichment, as well as other applicable equitable doctrines.

11. Plaintiffs claim for negligent misrepresentation is barred because there was an enforceable contract between the parties and Plaintiff's alleged harm is related to the subject matter of that contract.

TKO reserves the right to amend this Answer to allege additional affirmative defenses if subsequent investigation warrants the same.

## III.
## TKO'S ORIGINAL COUNTERCLAIM

TKO StaffPros, LLC asserts the following claims for affirmative relief and files this Counterclaim Against T1 G1 Dallas Solar Module (Trina) LLC and would respectfully show the Court as follows:

### PARTIES, JURISDICTION, AND VENUE

1. TKO is a staffing company organized and existing under the laws of the United States of America, with its main office and principal place of business located in Saltillo, Mississippi. TKO has appeared in this matter.

2. T1 G1 Dallas Solar Module LLC, formerly T1 G1 Dallas Solar Module (Trina) LLC, is a Texas limited liability company who has appeared in this lawsuit.

3. Venue is proper in this Court because T1 filed its Complaint in this Court, and because pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas.

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as TKO is diverse from T1 and the value of the claim exceeds the jurisdictional amount.

5. This Court has personal jurisdiction over T1 as it submitted to this Court's jurisdiction by filing its complaint. Moreover, T1 resides in the Northern District of Texas.

## FACTUAL ALLEGATIONS

### A. The Service Agreement between TKO and T1

6. TKO provides staffing services to companies to help with their employment needs. TKO has been in business since 2018 and is run by the husband and wife team of Mike and Andrea Jones.

7. On March 28, 2024, T1 executed and delivered to TKO a Service Agreement (the "Agreement") under which TKO would provide staffing services for T1 in exchange for payment based on agreed rates. T1 sources, screens, interviews, and runs a national background check on employees, which it then presents to T1. If accepted, TKO pays the employees' wages and benefits and handles the other back-office items. TKO then invoices T1 for the amounts it has paid the employees plus a fixed markup for each employee, as defined in Exhibit A to the Agreement.

8. Under the Agreement, T1 agreed to pay TKO within thirty (30) days of the date of TKO's invoices for the staffing services provided to T1 and for any additional costs or fees as set forth in the Agreement. Additionally, interest accrues at a rate of 1.50% per month on any unpaid balances pursuant to the Agreement. A true and correct copy of the Agreement is attached as **Exhibit 1.**

9. Under the Agreement, T1 agreed to not solicit or hire TKO employees during the term of the Agreement.

10. The Agreement also permits TKO to charge T1 an early conversion fee if T1 converts an assigned TKO employee to another staffing company or to T1 Energy directly without providing TKO a thirty (30) day notice.

**B. The staffing services provided by TKO**

11. Despite signing the Agreement in late March, TKO did not start providing staffing services to T1 until August 2024. At that time, T1 invited the three staffing companies it had approved – TKO, Core Personnel, and XL Staffing – to start providing employees for its manufacturing facility in Wylie, Texas. T1 decided that TKO and XL would compete for the production openings, and that Core Personnel would handle the specialized skill openings.

12. Several weeks after the initial round of hirings, T1 selected TKO as the primary supplier for T1's hiring needs in large part because, of the initial round of hirings, only 1 of 13 employees hired by TKO did not work out, whereas the other company lost 12 of 23 employees. T1 informed TKO that its selection as primary supplier was due to its low turnover rate and positive feedback from supervisors about TKO's employees' performance.

13. In the past year since T1 selected TKO as its primary supplier, TKO has placed almost 800 employees with T1.

14. TKO has performed all the services as agreed upon by the parties under the Agreement, including running a search for each employee through a national criminal database.

15. In fact, during its time working for T1, TKO has provided excellent service above and beyond what other staffing agencies could have provided, all to meet T1's requests and demands for service to meet its needs. This includes:

a. Successfully setting up 75-100 interviews set up on only a couple days' notice;

b. Being asked to set up large numbers of interviews the next day, then two hours later being called to cancel them for various reasons and then being called a couple of hours after that, requesting the interviews to be conducted, all resulting in hundreds of phone calls with a few hours period;

c. Setting up a new website especially for T1's managers to access certain key metrics;

d. Integrating T1 into TKO's web document storage system so that T1 could access the information in real time, including the status of background checks for candidates;

e. Starting an employee-of-the-month program to recognize and reward performance with gifts ranging from $800- $2000, depending upon how many employees were recognized by T1's supervisors;

f. Donating $2500 worth of gifts for an employee drawing;

g. Changing TKO's system and internal organization to meet T1's demands that exceeded those usually requested by staffing clients;

h. Maintaining three representatives onsite at T1;

i. Having upper-level TKO management visit T1's site every other week in addition to the onsite staff;

j. Maintaining a list of available "ready to go candidates" just for T1 even when T1 was not actively hiring; and

k. Maintaining a turnover rate of well below industry standards for the duration of the contract.

16. TKO issues separate weekly invoices to T1 for the staffing services provided by TKO.

**C. T1 has consistently has issues making its payments on time.**

17. T1's first invoice for TKO's services was due paid 50 days late. Starting around December 2024, the other staffing agencies providing employees to T1 also had to reach out to T1 management because of unpaid, past due invoices, including through legal counsel. TKO experienced similar late payments by T1 during 2025, and one point the parties were working on a payment plan for T1, which never came to fruition. These were all defaults under the Agreement.

18. In early 2025, T1 even notified all the staffing agencies that they were not going to be able to make payments for several weeks. When one of the staffing agencies refused to extend T1's credit terms, T1 terminated its contract.

19. Effective April 23, 2025, TKO agreed to reduce its markup for its staffing services from 35 percent to 30 percent. This came upon T1's demand for such a reduction or face termination of the Agreement.

**D. T1 fabricates issues with background checks to get out of paying for the services and employees provided by TKO.**

20. As part of the Agreement, TKO performs a search of one or more national criminal databases for potential employees. TKO performed this search on all the employees it placed with T1 using a system it has developed over the years. This system involves running a search through at least one of three national criminal databases. Once the search is completed, TKO employees then confirm whether or not there is any past criminal conduct in the record. If there is a record found, this information is then flagged and the candidate is either rejected or presented to T1 for evaluation.

21. TKO followed this process until late September 2025, when T1's security team became heavily involved in the hiring process. From this point forward, T1 requested that TKO provide a report for each employee that showed whether a background check had been run and if any criminal history was identified.

22. To accommodate this new request even though this was not required under the agreement, TKO implemented a new procedure wherein upon running a background check through one of its providers, TKO would complete a form that it had created to track these reports. TKO's practice for most clients is not to provide the actual background check results to T1 for each employee because these can often run dozens of pages as they contain a multitude of information about the candidates other than just criminal history and come in a web-based format.

23. TKO, consistent with its practice, did not provide the full background search reports to T1. Instead, TKO provided summary reports it created that showed the information about the

candidate, the date the background was processed, and any hits regarding criminal history. These summary reports, however, are the ones that T1 alleges in its Complaint were "fabricated." At no point did TKO represent to T1 that these summary reports were the full report generated by the background search company TKO used to run the report. And no point did TKO not run actually run background checks on any candidates for T1.

24. Since T1 implemented the new process requiring TKO to verify the background reports had been run, only 2 of the 83 candidates TKO submitted for hiring were later discovered to have a criminal background. In at least one of the cases, the charges were only reported at the county level and thus did not appear on the national database search that TKO ran pursuant to the Agreement.

25. While this is unfortunate, it is not an uncommon issue in the staffing industry on occasion to have a candidate with a criminal record not be identified or flagged in the background check process due to a number of reasons, especially when hundreds of candidates are being processed in a short time frame.

26. In fact, TKO is aware that the other staffing agency servicing T1 in one instance had 5 out of 43 new hires go through the screening process without identifying that they had a criminal record. T1 itself has even run into issues with the background checks it uses, causing it to change providers. T1 also changed its policy on how background checks were handled four times since TKO started working with them.

27. Despite all this, of the 724 employees placed by TKO at T1, only a handful have had issues with criminal backgrounds not being identified during the screening process.

28. T1, however, has used this as a pretext to terminate the Agreement and refuse to pay TKO for the employees it has placed without incident at T1. Even more egregiously, T1 is

demanding that TKO pay back all the money paid it has paid to TKO over the life of the Agreement, even though more than two-thirds of this directly covered the wages and benefits of the worker at T1 placed at its factory.

**E. T1 defrauds TKO into providing several weeks of employees with no intent to ever pay for TKO for its services.**

29. T1 alleges in its Complaint that it identified alleged alterations in the background reports provided by TKO on October 27, 2025.

30. Knowing this, T1 nonetheless proceeded to continue using the employees that TKO had recruited and hired for T1 pursuant to the terms of the Agreement. And pursuant to the Agreement, T1 incurred the obligation to pay TKO for those employees.

31. T1 continued using TKO's employees until November 21, 2025, when T1 notified TKO that it was allegedly in breach of the Agreement for failure to perform background checks under Section 1(c) and that, as a result, T1 was withholding payments pending further investigation and immediately terminating the Agreement.

32. This shocked TKO as there had been no follow up from the discussions in late October or additional discussions about TKO's background check process.

33. Now, however, it is readily apparent that T1 never had any intention of paying TKO for the employees and staffing services it continued to request from TKO and that TKO provided since the security team took over the process in late September. All the unpaid invoices – totaling $2,415,661.04 – date from September 24, 2025, through the final date of service on November 21, 2025.

34. Even more, T1's security team had started conducting their own background checks around the time they became involved in September 2025. Despite this, T1 still pretended to rely

on the background check summary reports provided by TKO when in reality they were doing their own background checks.

35. T1's claims about the background checks being grounds for not paying TKO for its services is further proven false by the Agreement. Section 6 directly addresses the question of what happens if TKO should miss a background check by providing indemnification protection to T1.

36. Finally, as noted above, T1 previously defaulted on its payment obligations under the Agreement to TKO and has a history of late payments with other staffing companies.

37. Thus, after raising the false issues with the background checks in October 2025, T1 decided to continue using TKO-sourced employees in its factory through end of October with no intent to pay TKO for those employees and services provided. TKO would not have continued providing services to T1 had it known that T1 had no intention of paying for those employees or services.

38. T1 owes TKO at least $2,415,661.04 for services provided under the Agreement, which amount remains outstanding and owing in full. This amount for staffing services provided by TKO has accrued and continues to accrue interest at a rate of 1.50% pursuant to the Agreement.

**F. T1 directly hires TKO's employees in violation of the Agreement.**

39. To add insult to injury, when T1 abruptly and without proper notice terminated the Agreement on November 21, 2025, it converted (or attempted to convert) 229 of TKO's employees into its own employees by directly hiring them.

40. Section 8 prohibits T1 from soliciting or hiring any of TKO's workers for 90 days after the termination of the Agreement. T1, however, admits to doing this in its Complaint.

41. Exhibits A and B to the Agreement also address the fees that T1 is required to pay of a TKO assigned employee is hired directly by T1. Under Exhibit A, T1 is required to pay an

"Early Conversion Fee" for such employees based on the hours worked on the date of conversion. Exhibit B to the Agreement sets forth the terms under which T1 may directly hire any employees placed by TKO if those employees have not worked any hours. Based on the information available, T1 owes TKO an early conversion fee of at least $97,750.00 for the TKO employees it hired.

42. Upon information and belief, nearly a third of TKO's 229 employees who were working at T1 on November 21, 2025, were directly hired by T1. Some of these decided not to remain with T1 for various reasons, including lack of work. But, upon information and belief, very few, if any, refused to convert to T1 because they did not want another criminal background check run, contrary to T1's allegation.

43. Furthermore, upon information and belief, T1 instructed the remaining TKO employees who T1 did not directly hire to sign on with one of the other staffing companies if they wanted to continue working at the T1 facility.

44. By a letter dated December 12, 2025, TKO, through its counsel, sent a Demand for Payment to T1, informing T1 of its default for failure to pay for the services provided by TKO, plus accrued interest and fees, in accordance with the Agreement, totaling $2,513,411.04. The demand letter gave T1 until Decembmer 31, 2025, to make payment.

45. Instead of making payment or even responding to TKO's demand letter, T1 filed this suit against TKO on December 31, 2025, claiming that, among other things, it has been defrauded and as a result it should not have to pay the $2.5 million owed plus be refunded the entirety of the $17 million it has paid TKO for the 724 employees TKO has provided to T1.

46. This is a preposterous stance. TKO provided employees to T1 and screened those employees in accordance with its obligations under the Agreement. T1, deciding that it did not want to pay TKO for those employees, nonetheless, continued to work with TKO to use and benefit

from the employees and services TKO provided even though T1 had already decided that it was not going to pay TKO for those additional employees.

47. T1 is fabricating excuses to try to avoid its payment obligations to TKO under the Agreement. TKO now brings this counterclaim to recover what it is rightfully owed by T1 for the services provided and for the additional damages caused by T1's wrongful conduct.

## CAUSES OF ACTION

48. TKO asserts the following causes of action against T1 based on the allegations above.

### Count One: Breach of Contract – Failure to Pay

49. TKO incorporates in this section all the factual allegations made in this Counterclaim.

50. TKO and T1 entered into a valid agreement for TKO to provide staffing services to T1 on certain terms and conditions as evidenced by the Agreement.

51. TKO performed its services and fulfilled its other obligations in accordance with the terms and conditions imposed by the Agreement.

52. T1 materially breached its obligations under the terms of the Parties' agreement by failing to pay amounts owed to TKO as they became due.

53. TI also materially breached its obligations under the terms of the Parties' agreement by failing to pay the early conversion fee and/or direct hire fees owed under the Agreement for TKO employees that T1 converted.

54. T1's alleged claims that TKO breached the Agreement by failing to perform background checks, even if true, would not relieve T1 of its payment obligations under the Agreement.

55. Despite TKO's demand for payment, T1 remains in default of its obligation to make complete and timely payments to TKO for the services rendered. Such acts and omissions constitute material unexcused breaches of the Parties' agreement, and T1 remains in default.

56. As a direct and proximate result of T1's breaches, TKO has suffered damages of at least $2,513,411.04, plus interest. TKO is thus entitled to recover its damages from T1, which include, without limitation, all amounts owed under the Agreement, plus late fees, other fees chargeable under the Agreement, and interest on the amounts owed.

57. All applicable credits and offsets, if any, have been applied to the amounts owed under the Agreement.

**Count Two: Breach of Contract – Breach of Non-Solicitation Agreement**

58. TKO incorporates in this section all the factual allegations made in this Counterclaim.

59. TKO and T1 entered into a valid agreement for TKO to provide staffing services to T1 on certain terms and conditions as evidenced by the Agreement.

60. TKO performed its services and fulfilled its other obligations in accordance with the terms and conditions imposed by the Agreement.

61. T1 materially breached its obligations under the terms of the Parties' agreement by hiring TKO employees directly.

62. T1's hiring of TKO employees breached the Agreement's non-solicitation provision. Such acts constitute material unexcused breaches of the Parties' agreement.

63. As a direct and proximate result of T1's breaches, TKO has suffered damages in excess of the minimum jurisdictional limits of this Court and is entitled to recover its damages from T1 in an amount to be established at trial.

**Count Three: Common Law Fraud**

64. TKO incorporates in this section all the factual allegations made in this Counterclaim.

65. In or around late September 2025, T1 represented to TKO that it wanted to continue using TKO's services and employees provided under the Agreement and that T1 would pay TKO for those services.

66. This representation was material to TKO to continue providing services and employees under the Agreement.

67. This misrepresentation was false when made as T1 had no intent to pay TKO for those services.

68. This misrepresentation was made with the intent for TKO to continue providing services, and TKO reasonably relied on this representation given the history of payment by T1.

69. TKO has been injured by T1's misrepresentation in the form of both direct and consequential damages for the amounts owed under the Agreement plus additional damages suffered due to T1's fraudulent conduct in an amount to be determined at trial.

70. In addition, because TKO's injury resulted from T1's actual fraud, gross negligence, or malice, TKO is entitled to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a) in an amount to be determined at trial.

**Count Four: Declaratory Judgment**

71. TKO incorporates in this section all the factual allegations made in this Counterclaim.

72. T1 has alleged that TKO failed to perform its duty under the Staffing Agreement with regard to the performance of certain background checks under the Agreement. T1 has alleged

that it elected to treat this as a material breach of the Agreement and that T1 was thus entitled to terminate the Agreement immediately and without notice. T1 further alleges that TKO's alleged breach of the Agreement nullified any T1 payment obligation under the Staffing Agreement such that T1 does not owe TKO any further payment under the Agreement.

73. TKO denies that it breached the Agreement and that TKO had any right to terminate the Agreement without proper notice as required under the Agreement.

74. TKO also denies that T1's payment obligations under Section 3 of the Agreement have been in any way nullified regardless of whether or not TKO breached its obligations under Section 1(c) of the Agreement.

75. TKO thus seeks a declaration under the Federal Declaratory Judgment Act that TKO must satisfy its payment obligations under the Agreement to pay TKO for all the services provided through the termination of the Agreement.

76. There is an actual, present, and justiciable controversy between T1 and TKO regarding the parties' respective obligations under the Agreement that falls within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. Resolution of this controversy would protect TKO's rights under the Agreement, prevent it further injury, and terminate the uncertainty or controversy giving rise to this action.

**ATTORNEY'S FEES**

77. TKO incorporates in this section all the factual allegations made in this Counterclaim.

78. As a result of T1's default, Plaintiff has engaged the law firm of Clark Hill PLC to bring this action. All conditions precedent to TKO's right to recover attorney's fees from T1 have been satisfied or will be satisfied prior to the trial of this lawsuit.

79. TKO is therefore entitled to recover its reasonable attorney's fees incurred in the prosecution of this action under Chapter 38 of the Texas Civil Practices and Remedies Code and any other applicable law or agreement.

## CONDITIONS PRECEDENT

80. All conditions precedent to TKO's right to assert the claims and causes of action in this action have occurred or have been satisfied, waived, or excused.

## IV.
## REQUEST FOR RELIEF

Counter-Plaintiff TKO StaffPros, LLC respectfully requests the following relief from the Court:

a. Judgment that T1 take nothing on its claim against TKO and be denied all relief requested;

b. Judgment against T1 for the amount of the outstanding balances due under the Agreement to TKO, including interest and other applicable fees;

c. Judgment against T1 for TKO's damages as a result of T1's breach of the Agreement's non-solicitation provision;

d. Judgment against T1 for TKO's damages as a result of T1's breach of the Agreement's Direct Hire Agreement;

e. Judgment against T1 for the actual and consequential damages caused by T1's fraudulent conduct;

f. Judgment against T1 for exemplary damages for T1's fraudulent conduct;

g. Attorney's fees and expenses;

h. Pre- and post-judgment interest as provided by law;

i. Costs of suit;

j. Such writs and processes as may be necessary to aid in the collection of this judgment; and

k. Such other and further relief to which TKO may be justly entitled.

Respectfully submitted,

**CLARK HILL PLC**

**TATE L. HEMINGSON**
State Bar No. 24064370
themingson@clarkhill.com
**WHITNEY J. HOUSE**
State Bar No. 24130261
whouse@clarkhill.com
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 651-4300
(214) 659-4007 (Fax)

**ATTORNEYS FOR**
**TKO STAFFPROS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2026, a true and correct copy of the foregoing document was electronically served via the ECF filing portal.

**TATE L. HEMINGSON**