**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **T1 G1 DALLAS SOLAR MODULE (TRINA) LLC**<br><br>**Plaintiff/Counter-Defendant,**<br><br>**v.**<br><br>**TKO STAFFPROS, LLC,**<br><br>**Defendant/Counter-Plaintiff.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 4:25-CV-01470-O** |

**TKO STAFFPRO, LLC'S FIRST AMENDED COUNTERCLAIM**

Pursuant to Fed. R. Civ. P. 15(a)(1)(B), TKO StaffPros, LLC ("TKO") asserts the following claims for affirmative relief against T1 G1 Dallas Solar Module (Trina) LLC ("T1") and would respectfully show the Court as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. TKO is a staffing company organized and existing under the laws of the United States of America, with its main office and principal place of business located in Saltillo, Mississippi. TKO has appeared in this matter.

2. T1 G1 Dallas Solar Module LLC, formerly T1 G1 Dallas Solar Module (Trina) LLC, is a Texas limited liability company who has appeared in this lawsuit.

3. Venue is proper in this Court because T1 filed its Complaint in this Court, and because pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Texas.

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as TKO is diverse from T1 and the value of the claim exceeds the jurisdictional amount.

5. This Court has personal jurisdiction over T1 as it submitted to this Court's jurisdiction by filing its complaint. Moreover, T1 resides in the Northern District of Texas.

## FACTUAL ALLEGATIONS

### A. The Service Agreement between TKO and T1

6. TKO provides staffing services to companies to meet their employment needs. Founded in 2018 and operated by the husband and wife team of Mike and Andrea Jones, TKO specializes in sourcing and matching potential employees with its employer clients .

7. T1 operates a solar module manufacturing facility in Wilmer, Texas. T1 was formerly known as Trina Solar US Manufacturing Module 1, LLC) and was a subsidiary of a large Chinese solar company named Trina Solar. Shortly after opening in November 2024, Trina Solar sold the Wilmer facility to what is now known as T1 G1 Dallas Solar Module (Trina) LLC, a strategic maneuver to avoid regulatory scrutiny and potential restrictions on Chinese-controlled companies accessing tax benefits under the Inflation Reduction Act. Though organized under Texas law, T1 still remains owned in part by China-based Trina Solar, maintains a "commercial partnership with Trina Solar," and has "entered into a series of commercial support and technology licensing agreements with Trina." Trina Solar also maintains several seats on the T1's board.

8. On March 28, 2024, T1 (then still Trina Solar US Manufacturing Module 1, LLC), through its "HR Head," Stephanie Yang Shao, executed and delivered to TKO a Service Agreement (the "Agreement"). Under the Agreement, TKO would "supply workers to [T1] as [T1] may from time to time request to work under [T1`s] direction, control, and supervision." T1 agreed

to pay TKO at a 35% markup over the temporary associate pay rate for all positions. A true and correct copy of the Agreement is attached as **Exhibit 1.**

9. Under the Agreement, TKO would recruit, screen, interview, and run a national background check on potential employees, who would then be presented to T1. If accepted for assignment, the Agreement called for TKO to pay the employees' wages and benefits and handle other back-office items. TKO would then invoice T1 for the amounts paid to the employees plus a fixed markup of 35% per employee, as detailed in Exhibit A to the Agreement.

10. TKO modified this arrangement several months later, in August of 2024. TKO contracted with Signature Back Office Solutions ("Signature") to cover the employees' payroll and the associated back-office responsibilities. Once TKO was paid by T1, TKO would pay Signature. T1 knew of this arrangement and communicated with Signature directly on numerous occasions.

11. The Agreement required T1 to pay TKO's invoices within thirty (30) days, with interest accruing at 1.50% per month on any unpaid balances. TKO typically invoiced T1 on a weekly basis for each set of job candidates it requested.

12. The Agreement prohibited T1 from soliciting or hiring TKO employees during the term of the Agreement and for 90 days after termination. The Agreement further authorized TKO to charge T1 an early conversion fee if T1 converted (i.e. hired) an assigned TKO employee directly or through another staffing company without providing TKO thirty (30) days' notice. Exhibit A to the Agreement sets forth the billing rate, and Exhibit B to the Agreement governs direct placement hires.

**B. T1 selects TKO for its exceptional staffing services**

13. Although the Agreement was signed in late March 2024, TKO did not begin providing staffing services to T1 (then still Trina) until August 2024 as the facility was preparing to open. At that time, T1 invited three approved staffing companies – TKO, Core Personnel, and XL Staffing – to supply employees for its manufacturing facility in Wilmer, Texas. T1 decided that TKO and XL would compete for the production openings, while Core Personnel would handle the specialized skill openings.

14. Several weeks later, T1 selected TKO as its primary supplier based on TKO's exceptional performance during the initial round of hirings, where only 1 of 13 TKO-placed employees failed to work out, compared to 12 of 23 employees from the other company. Turnover rates represent a critical metric in the staffing industry, particularly within manufacturing, where turnover rates average around 28% annually. Reduced turnover yields substantial cost savings for employers through lower onboarding and training expenses, while enhancing overall productivity. Turnover percentage serves as a principal benchmark for evaluating a staffing company's service quality for its clients. T1 informed TKO that its selection as the primary supplier stemmed from its low turnover rate and the positive feedback from supervisors about the performance of TKO-placed employees.

15. Since the final quarter of 2024, TKO has placed 724 employees with T1, achieving a turnover rate well below the national average of 28%. In fact, for the 2nd and 3rd quarters of 2025, for example, TKO's turnover rate was almost half the national average for 2025 at 15.62%.

16. In short, TKO delivered exceptional service exceeding industry norms and T1's initial expectations. The contract with T1 represented the largest contract TKO has signed to date,

and TKO made extraordinary effort—going far beyond the services required by the Agreement—to guarantee its success, including:

a. Arranging 75-100 interviews on only a couple days' notice;

b. Accommodating last-minute cancellations and re-scheduling that required hundreds of phone calls with a few hours period;

c. Creating a custom website for T1's managers to access certain key metrics;

d. Integrating T1 into TKO's electronic document storage system for T1 to have access to information in real time, including the status of background checks for candidates;

e. Launching an employee-of-the-month program to reward employees whose performance was recognized by T1's supervisor, with gifts ranging from $800-$2000s;

f. Donating $2500 worth of gifts for an employee drawing;

g. Restructuring TKO's internal operations and organization to meet T1's unique (and excessive) demands;

h. Maintaining three representatives onsite at T1;

i. Having senior TKO management visit T1's site bi-weekly in addition to the onsite staff;

j. Maintaining a pool of "ready to go candidates" exclusively for T1 during non-hiring periods; and

k. Achieving a turnover rate well below industry average for the duration of the contract.

17. TKO consistently prioritized T1's needs and did so at the highest industry standard. Even when T1 imposed hiring freezes of new workers, TKO continued to recruit and maintain a dedicated roster of candidates specifically for T1, thereby ensuring a readily available pool of qualified workers when T1 was ready to resume hiring.

**C. T1's consistent payments delays and defaults**

18. That same level of commitment was not reciprocated. T1's first invoice was paid 50 days late. Delinquent payments became a pattern, and, on multiple occasions, TKO had to

threaten to discontinue services if T1 did not pay its outstanding, past due invoices, which frequently exceeded a million dollars.

19. T1's failure to timely pays staffing vendors was not unique to TKO. Other staffing agencies serving T1 also had to pursue unpaid invoices, including through legal counsel.

20. In early 2025, T1 notified all of its staffing agencies of its inability to make payments for several weeks. When one of the staffing agencies refused to extend T1's credit terms, T1 terminated its contract.

21. Effective April 23, 2025, TKO agreed to reduce its markup for its staffing services from 35 percent to 30 percent upon T1's demand, and under the threat of termination.

**D. T1 fabricates issues with background checks to avoid payment**

22. As required by the Agreement, TKO searched one or more national criminal databases for each potential employee. TKO performed this search on every single employee placed with T1. This system, developed over years of experience, involves running a search through at least one of three national criminal databases, confirming whether a candidate has a record of any past criminal conduct, using the industry standard "seven-year rule." If a criminal record is found, this information is flagged and the candidate is either rejected or presented to T1 for evaluation on a case-by-case basis.

23. TKO followed this process until late September 2025, when T1's security team became involved. At this time, T1's security team, led by Jason Compton, effectively took over the hiring process from the human resources department and Stephanie Yang Shao, the Chief Human Resources Officer. From this point forward, T1's background check policy departed from the industry standard. Compton and his team demanded that TKO provide a report for each

candidate showing whether a background check had been conducted and if any criminal history was identified.

24. Though not required under the Agreement, TKO agreed to accommodate this new request by creating summary forms after running a background check through one of its providers. TKO's standard practice avoids sharing full provider reports with clients because they can run dozens of pages, include personal, non-criminal data and information, and come in a web-based format that does easily transpose into a report format.

25. Accordingly, TKO did not provide the raw reports, instead providing these internal summary reports, which showed information about the candidate, the background processing date, and any hits regarding criminal history. T1 now mischaracterizes these summary reports as "fabricated," but TKO never represented them as full provider reports generated by the background search company. Indeed, TKO ran national background checks on **all** candidates, as required under the Agreement.

26. Since September 2025, only 2 of the 83 candidates TKO submitted for hiring were later discovered to have a criminal background. In at least one instance, the charges were only reported at the county level and did not appear on any national database search that TKO ran pursuant to the Agreement.

27. Occasional oversights are not an uncommon issue in the staffing industry, particularly with high-volume processing, and arise due to fragmented records or jurisdictional limits. But to address this, TKO would conduct periodic Criminal Background Audits, such as those conducted in January 2025 and again in August 2025.

28. Notably, in one day, another T1 staffing agency missed criminal records for 5 out of 43 new hires. T1 openly raised this issue in a meeting in July 2025 with its staffing vendors.

And even T1 itself has encountered similar issues, prompting four policy changes and provider switches since TKO started working with them. What's more, TI was for some time running background checks on candidates without their knowledge or consent.

29. Despite all this, of the 724 employees placed by TKO at T1, only a handful have had issues with undetected criminal backgrounds.

**E. T1 fraudulently induces TKO to continue providing services without any intent to pay**

30. T1 seized on these isolated instances as pretext to terminate the Agreement and withhold payment, even demanding repayment of all $17 million previously paid—despite over two-thirds of that amount covering direct employee wages and benefits. But T1 – and in particular Compton and his security team – had finally found an excuse to not only avoid making timely payments to TKO, but to avoid making any further payments at all. T1 then used this pretext to terminate the Agreement and refuse to pay TKO for the employees it has placed without incident at T1. Even more egregiously, T1 is demanding that TKO pay back all the money paid it has paid to TKO over the life of the Agreement, even though more than two-thirds of this directly covered the wages and benefits of the worker at T1 placed at its factory.

31. T1, and specifically Compton and Shao, along with other management at T1, hatched this plan to string along TKO in mid-to late-October 2025. As T1 itself alleges, it identified purported "alterations" in TKO's background reports on October 27, 2025. Around this same time, Compton and his team at T1 discussed a screening issue with TKO regarding one employee. Shortly after this, T1's human resources office informed TKO that it had been placed on hold and that TKO would not be able to fill any more orders. But T1 did not give TKO a reason for this hold – merely that was happening. Since T1 had recently discussed other issues with its staffing vendors around this same time, TKO was left wondering why it was being singled out.

32. TI nonetheless continued using TKO-sourced employees through November 21, 2025, incurring payment obligations under the Agreement. And TKO, through Signature, continued to pay employee wages and benefits, and provide back-office services for those employees during this same time. TI, and Shao in particular, intentionally kept TKO in the dark about their plan to terminate TKO, never once engaging with TKO to question it about its background check process or discuss its concerns.

33. Instead, on November 21, 2025, T1 notified TKO that it was allegedly in breach of the Agreement for failure to perform background checks under Section 1(c) and that, as a result, T1 was withholding payments for the staffing services pending further investigation and immediately terminating the Agreement.

34. This came as a shock as there had been no follow-up from the discussions in late October or inquiries into TKO's background check process and the concerns T1 had raised.

35. It is now evident that T1 had no intent to pay TKO for services requested or provided since late September 2025, which total $2,415,661.04. Indeed, TKO has learned that members of T1's management team, including Compton and Shao, met during the second week of November to discuss how to kick out TKO. T1 evidently decided around this time that the false concerns over TKO's background check reports were sufficient pretense to terminate the Agreement and avoid paying TKO.

36. T1, however, through the conduct of Compton, Shao, and others, continued to fraudulently induce TKO into providing services under the Agreement without any intent of paying TKO for those services.

37. Moreover, T1's security team began conducting their own background checks (without the candidates' consent) around the time they became involved in September 2025 but

feigned reliance on TKO's summaries. Despite this, T1 still pretended to rely on the background check summary reports provided by TKO when in reality T1's security team was performing its own background checks.

38. T1's non-payment claims are further undermined by Section 6 of the Agreement, which provides for indemnification for all claims, losses, or liabilities due to missed background checks, rather than excusing payment.

39. In sum, after fabricating concerns about the background checks in October 2025, T1 continued using TKO-sourced employees in its factory and placing requests for additional candidates through end of October with no intent to pay TKO for those employees and services provided. TKO would not have continued providing services to T1 had it known that T1 had no intention of paying for those employees or services. And this would have left T1 without the employees it needed to run its facility. TI thus intentionally strung TKO along so that it could keep using TKO's employees while it finalized its plans to take over those employees.

40. In reliance on TI's ongoing fraudulent inducement for TKO to continue providing services and employees, TKO did provide those services from September 24, 2025 – when T1's security team became involved – through the final date of service on November 21, 2025, in the amount of $2,415,661.04. In addition, TKO expended additional internal resources through internal payroll, travel, supplies, and advertising to prepare for the anticipated uptake in job positions promised by T1 and to maintain the list of ready-to-go candidates that TKO had consistently kept for T1 during the Agreement. These out-of-pocket costs incurred by TKO in reliance on T1's fraudulent promises to continue performance under the Agreement total at least $60,000.

**F. T1 directly hires TKO's employees in violation of the Agreement**

41. Compounding the injury, on November 21, 2025, T1 abruptly terminated the Agreement without notice and converted (or attempted to convert) 229 of TKO's employees by hiring them directly.

42. Section 8 prohibits T1 from soliciting or hiring any of TKO's workers for 90 days after the termination of the Agreement. T1, however, admits to violating this prohibition in its Complaint.

43. Exhibits A and B to the Agreement mandate early conversion and direct hire fees.. Under Exhibit A, T1 is required to pay an "Early Conversion Fee" for such employees based on the hours worked on the date of conversion. Exhibit B to the Agreement sets forth the terms under which T1 may directly hire any employees placed by TKO if those employees have not worked any hours. Based on the information available, T1 owes TKO an early conversion fee of at least $97,750.00 for the TKO employees it hired.

44. Upon information and belief, on November 21, 2025 – the same day it terminated TKO – T1 directly hired nearly one-third of TKO's 229 employees working at T1's facility and requested that the remaining TKO employees convert to other staffing agencies. Although some of these employees later left for reasons such as insufficient work, very few, if any, refused to convert to T1 because they feared another criminal background check, contrary to T1's allegation.

45. Furthermore, upon information and belief, T1 instructed the remaining TKO employees who T1 did not directly hire to sign on with one of the other staffing companies if they wanted to continue working at the T1 facility.

46. On December 12, 2025, TKO's counsel sent T1 a Demand for Payment, informing T1 of its default for failure to pay for the services provided by TKO, plus accrued interest and fees,

in accordance with the Agreement, totaling $2,513,411.04. The demand letter gave T1 until December 31, 2025, to make payment.

47. T1 ignored the  demand letter, and instead filed this suit against TKO on December 31, 2025, claiming that, among other things, it has been defrauded and as a result it should not have to pay the $2.5 million owed plus be refunded the entirety of the $17 million it has paid TKO for the 724 employees TKO has provided to T1.

48. This position defies reason. TKO fulfilled its screening and placement duties in accordance with its obligations under the Agreement. T1, unwilling to pay TKO for those employees, nonetheless, continued to work with TKO to use and benefit from the employees and services TKO provided, all the while plotting nonpayment.

49. T1 is fabricating excuses to evade its payment obligations. . TKO now brings these counterclaims to recover what it is rightfully owed by T1 for the services provided and for the additional damages caused by T1's wrongful conduct.

50. T1 owes TKO at least $2,415,661.04 for services provided under the Agreement, which amount remains outstanding and owing in full. This amount for staffing services provided by TKO has accrued and continues to accrue interest at a rate of 1.50% pursuant to the Agreement.

## CAUSES OF ACTION

51. TKO asserts the following causes of action against T1 based on the allegations above.

**Count One: Breach of Contract – Failure to Pay**

52. TKO incorporates in this section all the factual allegations made in this Counterclaim.

53. TKO and T1 entered into a valid agreement for TKO to provide staffing services to T1 on certain terms and conditions as evidenced by the Agreement.

54. TKO performed its services and fulfilled its other obligations in accordance with the terms and conditions imposed by the Agreement.

55. T1 materially breached its obligations under the terms of the Parties' agreement by failing to pay amounts owed to TKO as they became due.

56. TI also materially breached its obligations under the terms of the Parties' agreement by failing to pay the early conversion fee and/or direct hire fees owed under the Agreement for TKO employees that T1 converted.

57. T1's alleged claims that TKO breached the Agreement by failing to perform background checks, even if true, would not relieve T1 of its payment obligations under the Agreement.

58. Despite TKO's demand for payment, T1 remains in default of its obligation to make complete and timely payments to TKO for the services rendered. Such acts and omissions constitute material unexcused breaches of the Parties' agreement, and T1 remains in default.

59. As a direct and proximate result of T1's breaches, TKO has suffered damages of at least $2,513,411.04, plus interest. TKO is thus entitled to recover its damages from T1, which

include, without limitation, all amounts owed under the Agreement, plus late fees, other fees chargeable under the Agreement, and interest on the amounts owed.

60. All applicable credits and offsets, if any, have been applied to the amounts owed under the Agreement.

**Count Two: Breach of Contract – Breach of Non-Solicitation Agreement**

61. TKO incorporates in this section all the factual allegations made in this Counterclaim.

62. TKO and T1 entered into a valid agreement for TKO to provide staffing services to T1 on certain terms and conditions as evidenced by the Agreement.

63. TKO performed its services and fulfilled its other obligations in accordance with the terms and conditions imposed by the Agreement.

64. T1 materially breached its obligations under the terms of the Parties' agreement by hiring TKO employees directly.

65. T1's hiring of TKO employees breached the Agreement's non-solicitation provision. Such acts constitute material unexcused breaches of the Parties' agreement.

66. As a direct and proximate result of T1's breaches, TKO has suffered damages in excess of the minimum jurisdictional limits of this Court and is entitled to recover its damages from T1 in an amount to be established at trial.

**Count Three: Common Law Fraud/Fraudulent Inducement**

67. TKO incorporates in this section all the factual allegations made in this Counterclaim.

68. In or around late September 2025, T1's security team, led by Jason Compton, took over responsibility for the hiring of candidates presented by TKO and those hired by T1. At this

time, T1, through Compton and Stephanie Yang Shao, TI's Chief Human Resources Officer, represented to TKO that they wanted to continue using TKO's employees and services provided under the Agreement, and that T1 would pay TKO for those services.

69. This representation was material to TKO's decision to continue providing services and employees under the Agreement.

70. Compton and Shao's representations that T1 wanted to continue using TKO's services and that T1 would pay for those services was false when made as T1 had decided to find pretext to kick TKO out of the T1 facility, not pay for the services it had provided, and directly hire the employees that remained.

71. Compton and Shao also deliberately withheld and failed to disclosure T1's intent to terminate TKO's Agreement on the pretext of the feigned concerns over the background checks. T1, Compton, and Shao had a duty to inform TKO of T1's intent to terminate the Agreement.

72. These misrepresentation and non-disclosures were made with the intent for TKO to continue providing staffing services to T1 during the time period so that T1 could then transition those employees over to its own payroll or that of another staffing company.

73. TKO reasonably relied on these representations when it continued providing candidates and back-office services for employees placed with T1 from September 24, 2025, through November 21, 2025. Had TKO known that T1 planned to kick out TKO, not pay over $2 million in invoices for services provided, and then steal those employees, TKO would not have provided those services to T1.

74. TKO has been injured by T1's misrepresentation in the form of both direct and consequential damages for the amounts owed under the Agreement plus additional out-of-pocket damages suffered due to TKO's reliance on T1's fraudulent conduct as discussed above.

75. In addition, because TKO's injury resulted from T1's actual fraud, gross negligence, or malice, TKO is entitled to exemplary damages under Texas Civil Practice & Remedies Code Section 41.003(a) in an amount to be determined at trial.

**Count Four: Tortious Interference with Contract**

76. TKO incorporates in this section all factual allegations made in this Counterclaim.

77. TKO maintains a valid and enforceable contract with Signature Back Office Services, a Professional Employer Organization ("PEO") that serves as the employer of record for TKO-placed employees in T1's Texas facility. Under this contract, TKO is obligated to pay Signature for payroll, taxes, workers' compensation, and unemployment benefits upon receipt of payment from T1 for the corresponding staff services.

78. T1 knew or had reason to know of TKO's contractual relationship with Signature, as such PEO arrangements are common in the staffing industry for handling administrative employer duties in Texas, and in this case, because of T1's direct communications with Signature regarding TKO-placed employees at T1's facility during the period of TKO's engagement.

79. T1 willfully and intentionally interfered with this contract by refusing to pay over $2.5 million in outstanding invoices despite demands, with the knowledge that such non-payment would prevent TKO from fulfilling its obligations to Signature, thereby rendering performance more burdensome, difficult, or expensive, and causing injury.

80. T1's interference was not justified or privileged, as it stemmed from pretextual allegations of breach by TKO, which were fabricated to avoid legitimate payment obligations under the parties' Agreement.

81. As a direct and proximate result of T1's interference, TKO has suffered actual damages, including penalties, interest, and additional costs owed to Signature due to the breach, in an amount to be determined at trial.

**Count Five: Declaratory Judgment**

82. TKO incorporates in this section all the factual allegations made in this Counterclaim.

83. T1 has alleged that TKO failed to perform its duty under the Staffing Agreement with regard to the performance of certain background checks under the Agreement. T1 has alleged that it elected to treat this as a material breach of the Agreement and that T1 was thus entitled to terminate the Agreement immediately and without notice. T1 further alleges that TKO's alleged breach of the Agreement nullified any T1 payment obligation under the Staffing Agreement such that T1 does not owe TKO any further payment under the Agreement.

84. TKO denies that it breached the Agreement and that TKO had any right to terminate the Agreement without proper notice as required under the Agreement.

85. TKO also denies that T1's payment obligations under Section 3 of the Agreement have been in any way nullified regardless of whether or not TKO breached its obligations under Section 1(c) of the Agreement.

86. TKO thus seeks a declaration under the Federal Declaratory Judgment Act that TKO must satisfy its payment obligations under the Agreement to pay TKO for all the services provided through the termination of the Agreement.

87. There is an actual, present, and justiciable controversy between T1 and TKO regarding the parties' respective obligations under the Agreement that falls within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. Resolution of this controversy

would protect TKO's rights under the Agreement, prevent it further injury, and terminate the uncertainty or controversy giving rise to this action.

**ATTORNEY'S FEES**

88. TKO incorporates in this section all the factual allegations made in this Counterclaim.

89. As a result of T1's default, Plaintiff has engaged the law firm of Clark Hill PLC to bring this action. All conditions precedent to TKO's right to recover attorney's fees from T1 have been satisfied or will be satisfied prior to the trial of this lawsuit.

90. TKO is therefore entitled to recover its reasonable attorney's fees incurred in the prosecution of this action under Chapter 38 of the Texas Civil Practices and Remedies Code and any other applicable law or agreement.

**CONDITIONS PRECEDENT**

91. All conditions precedent to TKO's right to assert the claims and causes of action in this action have occurred or have been satisfied, waived, or excused.

## IV.
## REQUEST FOR RELIEF

Counter-Plaintiff TKO StaffPros, LLC respectfully requests the following relief from the Court:

a. Judgment that T1 take nothing on its claim against TKO and be denied all relief requested;

b. Judgment against T1 for the amount of the outstanding balances due under the Agreement to TKO, including interest and other applicable fees;

c. Judgment against T1 for TKO's damages as a result of T1's breach of the Agreement's non-solicitation provision;

d. Judgment against T1 for TKO's damages as a result of T1's breach of the Agreement's Direct Hire Agreement;

e. Judgment against T1 for the actual and consequential damages caused by T1's fraudulent conduct and tortious interference;

f. Judgment against T1 for exemplary damages for T1's fraudulent conduct and tortious interference;

g. Attorney's fees and expenses;

h. Pre- and post-judgment interest as provided by law;

i. Costs of suit;

j. Such writs and processes as may be necessary to aid in the collection of this judgment; and

k. Such other and further relief to which TKO may be justly entitled.

Respectfully submitted,

**CLARK HILL PLC**

**TATE L. HEMINGSON**
State Bar No. 24064370
themingson@clarkhill.com
**WHITNEY J. HOUSE**
State Bar No. 24130261
whouse@clarkhill.com
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 651-4300
(214) 659-4007 (Fax)

**ATTORNEYS FOR**
**TKO STAFFPROS, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2026, a true and correct copy of the foregoing document was electronically served via the ECF filing portal.

**TATE L. HEMINGSON**